IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JIMMY DOE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 99 C 3945 |
| v. | ) | |
| | ) | Hon. John A. Nordberg |
| COOK COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# 2005 Monitors' Reports

BENJAMIN S. WOLF
Illinois Bar No. 3125607
SARAH SCHRIBER
Illinois Bar No. 6282106
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
312-201-9740

Monitoring Report

*Doe v. Cook County*
**Cook County Juvenile Temporary Detention Center**

by

Charles A. Fasano

September 30, 2005

**Introduction**

This report is submitted in partial fulfillment of the Memorandum of Agreement (MOA) in the above-captioned case. Following the practice established in my report of September 27, 2004, this report revisits the three areas covered in my earlier report — Health Services, Behavior Management, and Grievance Procedure — and also contains observations on Staffing and Visiting. In addition, this report contains a preliminary evaluation of the frequency and distribution of incidents involving youth, based on the monthly reports and data sheets that have been compiled since April 2005.

The preparation of this monitoring report included review and analysis of records and other data, including policies and procedures and reports of various kinds, as well as interviews of staff, supervisors, administrators, and incarcerated youth. Site visits and inspections of various portions of the facility have also been conducted throughout the year.

**Administration**

On June 13, 2005, the wait for permanent leadership at CCJTDC finally ended with the appointment of Jerry Robinson, who brings more than 30 years experience with the Chicago Police Department. I have met with Superintendent Robinson on a number of occasions since that time, with counsel for the parties and my co-monitor, Michael J. Mahoney, as well as privately.

Superintendent Robinson is currently working on a number of projects relevant to the MOA, including revising and clarifying the duties and responsibilities of the Assistant Superintendents and modifying procedures for investigating incidents and allegations against staff. Our discussions included a number of new projects and initiatives that are described in the appropriate sections below.

**Staffing**

During the past twelve to eighteen months, there have numerous instances in which a number of essential positions — including Detention Counselors, nurses, mental health staff, and investigative staff — have remained vacant for lengthy periods, which has affected security, supervision of youth, health services and other programs in a variety of ways. A number of reasons have been given for the delays in filling these positions, including cumbersome hiring policies and practices, salary levels that are not competitive with other public agencies and/or the private sector, and a reported inability to find candidates who are both qualified and acceptable to CCJTDC and other Cook County officials. In recent months, progress in filling many of these positions has been made, but some critical positions, including an investigator position and several health services positions, remain vacant.

The chronic failure to fill many positions at CCJTDC in a genuinely timely fashion continues to impede efforts to enhance security and supervision and provide the range of programs and services required by the MOA.

**Health Services**

The health services program at CCJTDC has been affected by several events during recent months that are described below. Some of these changes appear to be beneficial, but other changes are problematic, and still others cannot be assessed at this time.

Health services at CCJTDC suffered a loss with the resignation of Jacqueline Moore, R.N., Ph.D., who had served as the Administrator of Health Services for the past several years. Doctor Moore deserves the lion's share of the credit for numerous, significant improvements in health services at CCJTDC, which culminated in the health services program receiving accreditation by the National Commission on Correctional Health Care, which occurred in June 2004. Since her resignation, many of the administrative duties relating to health services have been assumed by Rebecca Chimetra, R.N., a very experienced nurse, and CCJTDC's Medical Director, Venkata Vallury, M.D. While Ms. Chimetra and Dr. Vallury have performed many administrative duties for the CCJTDC health services program previously, assuming these administrative duties limits the time these individuals can devote to clinical duties, which should be remedied without delay. However, several factors should be considered before the Health Services Administrator position is filled.

The position of Administrator of Health Services has not been a regular, full-time position in the Cook County corporate budget; instead, it has been a contractual position, which does not offer

3

**Health Services (continued)**

the normal range of benefits that are essential to attract and retain a qualified applicant.[1] This should be remedied immediately, which can occur within the next several months: the President and members of the Cook County Board of Commissioners are beginning the annual process of budget preparation and review that will culminate in a corporate budget for all Cook County agencies for FY 2006. This process must be completed by February 28, 2005, and it should include a permanent, full-time position with an adequate salary for this critical job. My final comments on this position and how it should be filled are provided at the conclusion of this section.

Another recent change in the health services delivery system at CCJTDC was initiated by Superintendent Robinson on September 7, 2005. On that date, nurses began the practice of administering medication to juveniles in their respective living units twice daily. Prior to this time, all youth receiving medication were brought to the Health Care Unit on the third floor between one and four times daily. These new medication rounds have required modification of some prescriptions to accommodate the new schedule of rounds, but health staff have reported that no youth have experienced adverse health effects as a result of these changes. Conducting medication rounds on living units or other portions of a juvenile facility are quite common and rarely present problems for the great majority of youth who receive either prescribed or over the counter drugs. As of September 28, 2005, health records disclosed that 111 juveniles were receiving medication during morning round, and 105 juveniles received medication during afternoon/evening rounds.

The new practice at CCJTDC should be evaluated carefully after 90 days of operation and periodically thereafter to ensure that (1) no youth have suffered any serious adverse health effects as a result of medication changes, and (2) staffing levels for nursing personnel are adequate to conduct these rounds as well as all other health services provided by nurses.

The long-standing practice of bringing youth to the Health Care Unit involved a substantial number of Detention Counselors to escort and supervise youth during this process and appears to have made it difficult to escort all youth enrolled in school to and from school areas in a sufficiently timely fashion to ensure that they received the number of classroom hours required by state law. In order to facilitate the transportation of youth to and from school, a new school schedule with staggered starts for various classes was also implemented on September 7, 2005, coinciding with the beginning of the new medication rounds. These two changes should facilitate more timely administration of medication and arrival at and departure from school.

---

[1] Ms. Moore maintained an independent consulting practice while employed at CCJTDC, explaining her willingness to accept a position of this nature with flexible hours. It is unlikely, however, that many qualified applicants for this position would be similarly situated and willing to accept such an arrangement.

4

**Health Services (continued)**

During my most recent visit to the Health Care Unit on September 28, 2005, I interviewed two juveniles who were being housed in the unit for medical reasons. These youth reported no complaints on any significance, although they both indicated that no educational material had been provided to them since their placement in the unit. This situation should be reviewed immediately, and appropriate remedial action taken so that youth held in the HCU are able to continue some modicum of educational programming, provided that this is not contraindicated by a health condition (e.g. - psychiatric problem).

One final note regarding medication and discharge planning for juveniles is in order. CCJTDC has recently initiated a practice whereby juveniles who have been receiving prescribed medication while incarcerated are provided with one week supply of medication at the time of discharge. This practice is commendable and should be continued, and facility administrators should ensure that adequate funding for this practice is included in future budgets.

During a September 28, 2005 meeting with health services staff, I was informed that nursing staff at CCJTDC has been experiencing turnover in recent months. While one new nurse has been hired recently, a vacancy for Head Nurse on the day shift as the result of a recent resignation remains unfilled. The Chief Psychiatrist has been interviewing candidates for a contractual position for a psychiatric nurse, which should be a valuable addition to the health services program at CCJTDC if he is able to fill this position.

Mental health services continue to be affected by staffing levels that remain problematic. There is a strong indication that additional psychiatric hours are needed at CCJTDC to maintain adequate diagnostic and treatment services to incarcerated youth. At present, one full-time psychiatrist is responsible for most services that require this level of training and expertise. One additional psychiatrist provides 4 hours of coverage (0.1 FTE) at CCJTDC on a weekly basis. As a result of this staffing level, the primary psychiatrist is faced with a large caseload that may not permit adequate time with each juvenile with mental health problems. In addition, the current staffing level does not provide for psychiatric coverage when the primary psychiatrist is absent due to illness, vacation, and other reasons. This situation suggests the need for at least one additional FTE psychiatrist, which should be filled with either one full-time person or two half-
time psychiatrists, in order to ensure consistency of treatment and continuity of care: the practice of retaining more psychiatrists, each of whom provides fewer hours of weekly coverage, does not provide the quality and consistency of care needed by this population.

Staffing levels for psychologists should also be reevaluated, particularly in light of the fact that the opening of the two special needs units will represent a new demand on several psychologists who are assigned to these units. While these units may permit a more efficient utilization of psychology staff, this status cannot be determined at present.

5

**Health Services (continued)**

Mental health services at CCJTDC should benefit from the implementation of a new screening instrument and procedure for routine mental health screening of youth admitted to the facility. For the past several months, health services staff have been working with Thomas Grisso, Ph.D., of the University of Massachusetts Medical School/National Youth Screening Assistance Project in preparation for use of the Massachusetts Youth Screening Instrument Second Version (MAYSI-2). In essence, all newly admitted youth would be interviewed using MAYSI-2 within 24 hours of admission to determine which youth are in need of an interview with a mental health professional. At present, the initial use of MAYSI-2 is currently scheduled for mid-October 2005, with one or more CCJTDC Caseworkers assigned to perform these interviews on 200 youth.

Discussions with mental health staff and a review of information on youth with special psychiatric needs revealed that many of these youth continue to be housed in many different living units throughout CCJTDC. This practice in all likelihood contributes to the substantial number of incidents and other behavior problems displayed by these juveniles and may compromise the effectiveness of the behavior management program that is being implemented at CCJTDC. The preferred practice of designating several living units for youth with these types of special needs offers a number of significant advantages.

First, the units themselves can be renovated with more appropriate equipment and furnishings, including doors more resistant to breakage and shattering, and designated observation rooms in these units (and in the health care unit) that are monitored continuously by cameras. This would permit better supervision by staff and help to reduce the number of self-inflicted injuries sustained by youth and the cost to replace damaged equipment and fixtures. Within the past week, Superintendent Robinson reported that the two living units designated for youth with special needs have been equipped with new doors of the type recommended. To date, I have not had the opportunity to inspect these units, but I intend to do so within the several weeks and will share the results of this visit with the parties.

Second, by concentrating most of the incarcerated youth with special needs in a few locations, the efficiency of mental health services themselves can be increased: staff could conduct group sessions in the units without compromising confidentiality of youth, and detention counselors could be included in treatment activities at the same time. Third, by clustering special needs youth in a few living units, facility administrators could select a small cadre of detention counselors with an interest in and aptitude for working with youth with mental health needs. In addition, this small staff cadre could receive specialized training appropriate for such work, a practice followed successfully with Correctional Officers working with adult inmates with special mental health needs at the Cook County Department of Corrections for a number of years.

In point of fact, the curriculum used in this training could easily be tailored to a juvenile

**Health Services (continued)**

population, and many of the staff who provide this training at CCDOC could be retained at a reasonable cost to provide comparable training to CCJTDC staff. Superintendent Robinson has indicated that staff assigned to the two special units will receive special training, although the content of this training is not currently known. I recommend that Superintendent Robinson consult with Carl Alaimo, Psy.D., Director of Mental Health Services at Cermak Health Services, regarding the curriculum for this training and the possibility of utilizing some of the professionals who provide this training to CCDOC personnel.

The selection of a new Health Services Administrator should be under the primary control of administrators from Cermak Health Services or other portions of the Cook County Bureau of Health Services. CCJTDC administrators should certainly participate in this screening and selection process, but they should not have the deciding votes. This decision can only be made by competent health professionals with expertise in correctional health services and pediatrics. Filling this position, while extremely important to the quality and autonomy of the health services program at CCJTDC, is only part of a larger issue, which should also be resolved without further delay.

For most of Doctor Moore's tenure at CCJTDC, there was some level of affiliation between CCJTDC health services and Cermak Health Services (CHS) administrators. In recent months, the strength of this affiliation appears to have waned significantly. While Sergio Rodriguez, M.D., Medical Director at CHS, has maintained clinical liaison and some degree of oversight of CCJTDC health services, administrative responsibility and authority that was previously exercised by John M. Raba, M.D., Chief Operating Officer at CHS, is no longer clearly in place. There are indications that administrators from the Cook County Bureau of Public Safety and Judicial Coordination (CCBPSJC) are attempting to gain greater and more direct control over health services at CCJTDC. These indications are ominous, particularly in light of practices of delays in hiring and other budget-driven practices that remain one of the paramount concerns of CCBPSJC.

Doctor Raba has informed me that he has already discussed the affiliation of the health services programs at CCJTDC and CHS with Daniel Winship, M.D., Chief of the Cook County Bureau of Health Services. One of the primary concerns involved in maintaining this critical affiliation relates to the ability to absorb what is essentially an unfunded mandate that totals approximately one million dollars. I strongly recommend that defendants' counsel provide reports on the status of this situation to both the monitors and counsel for plaintiffs, including the status of the affiliation between CHS and CCJTDC and any implications for the FY 2006 Cook County corporate budget.

In light of the changes and uncertainty regarding the health services program at CCJTDC, there is a significant possibility that the quality and accessibility of various health services activities and programs may no longer be consistent with the levels necessary for accreditation by the National

**Health Services (continued)**

Commission on Correctional Health Care (NCCHC) and/or those specified in the MOA. Some have suggested the need for a revisit by an NCCHC survey team of health professionals. I am recommending that, prior to initiating such a request, an informal audit of medical and mental health services at CCJTDC be conducted by a team consisting of Doctor Raba, Doctor Alaimo, and an experienced nurse from Cermak Health Services; in addition, I would participate in this audit, based on my experience as Director of Accreditation for NCCHC. I will attempt to schedule this audit no later than November 15, 2005 with results to be provided to the parties within 10 days of the date of the audit. Should this audit reveal significant deficiencies in health services, I will formally request a revisit by an NCCHC survey team.

**Behavior Management Program**

After numerous delays extending back several years, a revised Behavior Management Program (BMP)has finally begun to be implemented at CCJTDC. At a meeting in June 2005, I was informed that one activity to reward juveniles who achieve Level 4 status had been implemented, with additional activities to be scheduled. In recent months, facility administrators have also reported that all teachers in the Nancy B. Jefferson School had completed BMP training and were beginning to participate in awarding points under the BMP system.

During recent months, the BMP has been limited to three living units during a pilot phase of the revised program. According to Shiraz Butt, M.D., Chief Psychiatrist at CCJTDC, the BMP will be expanded to six additional living units within the next two weeks. I intend to visit several of these units before the end of October 2005 to view the operation of the BMP with newly participating youth.

**Grievance Procedure**

During May 2005 and June 2005, I reviewed a large sample (>75) grievances that had been submitted by youth and received responses from administrators and staff. This review revealed that the great majority of grievances concerned rather mundane, non-urgent matters such as the frequency of haircuts; in addition, the review also revealed that most grievances received responses that were reasonably timely. One recurring problem noted during this review was the fact that a significant percentage of grievances did not have the signatures of all staff who were involved in the resolution of the complaints.

Superintendent Robinson reported that he has issued new directions to staff regarding the handling of grievances, including provisions for daily collection of grievances from all living units by Ms. Gwen Burrell, who has previously been responsible for handling grievances.

**Visiting**

The new visiting room on the second floor of the facility has been in use for approximately one month, which enabled the practice of conducting visits on living units throughout the facility to be discontinued. Prior to the opening of the visiting room, lockers were installed in the second floor lobby, adjacent to the visiting area, which allows all visitors to secure personal property before visiting with residents or entering into secure areas in CCJTDC proper. Since its opening, the visiting room has been accommodating approximately 20 - 25 residents daily, with visits occurring five days per week. Regular visits occur every Monday, Wednesday, and Thursday, and open visiting also occurs on Saturday and Sunday.

While the new visiting room offers many indisputable advantages over the long-standing practice of visiting on living units, the amount of space now available for visits is significantly less than previously available. This has resulted in occasional limitations on the length of visits, which may be as brief as 30 minutes on those occasions when other visitors are waiting to see residents. The utilization of the visiting room should be closely monitored for at least the next 90 days, to determine usage and the frequency of visits whose duration must be limited due to the volume of visitors. At that time, Superintendent Robinson should evaluate the need to increase visiting hours to ensure that all visitors receive ample time to visit with incarcerated youth.

**Incidents, Classification, and Related Issues**

As noted in the Introduction, CCJTDC administrators have been compiling incident and disciplinary reports roughly since April 2005. The monitors have received voluminous quantities of reports and other data since that time, including Monthly Incident Tracking Sheets. These sheets contain information including date, names of youth involved, living unit, type of incident, type of injury (if any), and names of staff involved. Mr. Mahoney's report of September 23, 2005 has already revealed deficiencies in a significant number of incident and disciplinary disposition reports and discrepancies between incidents listed on the monthly tracking sheets and the reports contained in the monthly packets provided to the monitors. I am hopeful that Superintendent Robinson will take appropriate corrective action to rectify these problems and feel that no additional comment from me is necessary at this time.

I have conducted a basic analysis of data on incidents listed on the monthly tracking sheets to determine the frequency of incidents by living unit. The purpose of this analysis is to provide a preliminary indication of the appropriateness of classification and housing decisions. In other words, my efforts are intended to begin construction of an answer to the question whether youth who are frequently involved in fights, assaults, or other disruptive behavior are in fact housed on living units designated for more aggressive youth.

This analysis utilizes data from monthly incident tracking sheets for May, July, and August 2005. The incidence and location of incidents during these months is reflected in the table below.

**Incidents, Classification, and Related Issues (continued)**

INCIDENTS BY LIVING UNIT

| UNIT | MAY 2005 | JUL 2005 | AUG 2005 | TOTAL | CLASSIFICATION |
|---|---|---|---|---|---|
| 3-A | 3 | 0 | 0 | 3 | Intake (M) |
| 3-B | 1 | 0 | 0 | 1 | Intake (M) |
| 3-D | 6 | 5 | 3 | 14 | Intake (F) |
| 3-E | 3 | 0 | 6 | 9 | Intake (F) |
| 3-F | 9 | 11 | 4 | 24 | M- =12yoa |
| 3-G | 10 | 2 | 11 | 23 | F – Gateway et al. |
| 3-H | 3 | 2 | 5 | 12 | M; 13-14; small |
| 3-J | 7 | 6 | 21 | 34 | M;14-15; non-agg. |
| 3-K | 0 | 3 | 3 | 6 | M;13-14; smaller |
| 4-A | 4 | 17 | 3 | 24 | M;15-16; vy. agg. |
| 4-B | 3 | 4 | 3 | 10 | M;15+; mod agg |
| 4-C | 8 | 3 | 6 | 17 | M;16+; vy agg. |
| 4-D | 11 | 4 | 1 | 16 | M;16+; vy agg. |
| 4-E | 4 | 0 | 3 | 7 | M;15-16; vy. agg. |
| 4-F | 0 | 3 | 1 | 4 | M;15-16; |
| 4-G | 1 | 3 | 17 | 21 | M;15+; mod agg |
| 4-H | 12 | 2 | 1 | 15 | M;16+; vy agg. |
| 4-J | 6 | 4 | 2 | 12 | M;15+; mod agg |
| 4-K | 0 | 4 | 1 | 5 | M;15-16; vy. agg. |
| 4-3/3-K | 0 | 6 | 3 | 9 | |
| 5-A | 6 | 5 | 10 | 21 | M;15-16; |
| 5-B | 9 | 8 | 9 | 26 | M;15-16; |
| 5-C | 6 | 3 | 15 | 24 | M;14-15; mod agg |
| 5-D | 6 | 10 | 8 | 24 | M;15-16; |
| 5-E | 10 | 9 | 15 | 24 | M;14-15;non agg |
| 5-F | 19 | 4 | 10 | 33 | M;14-15;non agg |
| 5-G | 0 | 3 | 5 | 8 | M; Gateway |
| 5-H | 5 | 5 | 2 | 12 | M;15-16; |
| 5-J | 13 | 4 | 13 | 30 | M;14-15; mod agg |
| 5-K | 0 | 5 | 11 | 16 | M;15-16; |

This rudimentary analysis reveals some surprising results that merit further inquiry. Several of the units that allegedly house boys who are classified as non-aggressive or only moderately aggressive experience more frequent incidents than those units that house boys classified as highly aggressive. This suggests a review of housing unit designations or classification practices

11

**Incidents, Classification, and Related Issues (continued)**

or both may be in order.  This type of analysis, which I intend to continue using all of the data made available thus far and comparable data expected for the last three months of 2005, should also provide CCJTDC administrators with some important baseline data on training and assignment of detention counselors.  While I have not yet been able to determine the frequency of incidents involving individual detention counselors, it is my intent to continue this analysis until such information is available.  Hopefully, this may reveal information on whether the behavior and performance of specific line staff warrant additional supervision and scrutiny.  A cursory and non-systematic review of incident reports did disclose some of the same names proffered by plaintiffs counsel to the defendants as being involved in one or more problematic incidents, but it is not possible at this time to provide either corroboration or refutation or such suggestions.

**Conclusion**

It is always difficult to summarize a monitoring report that contains a mixture of positive accomplishment and new and recurring problems.  In the preceding pages, I have attempted to provide a fair and objective depiction of conditions at CCJTDC as they relate to a number of critical issues specified in the MOA, and I will continue to monitor these and other areas as identified by counsel and the parties.  At this time,  I also feel obligated to express my concern regarding the likelihood of compliance with those provisions of the MOA that require additional budget appropriations.  J.W. Fairman, Jr., Chief of the Bureau of Public Safety and Judicial Coordination, has reported that Cook County Board President John H. Stroger, Jr. has announced that budgets for all Cook County agencies under his control will not be increased in the coming fiscal year.  The potential effect of this situation should be discussed by the parties and counsel at the earliest possible opportunity.

# Doe v. Cook County

# Monitoring Report

# Cook County Juvenile Temporary Detention Center

By

Michael J. Mahoney

September 23, 2005

This is the second report prepared by this monitor in fulfillment of the Memorandum of Agreement (MOA) in the above identified case. This report will focus on the following three areas agreed upon by the parties:

- Staffing
- Policy Review and Implementation
- Youth Discipline

In preparation for this report the monitor reviewed records, policies, and incident and discipline reports, and conducted interviews with staff, administration and detained youth. Many site visits and tours of the facility were conducted throughout the year.

**STAFFING**

Paragraph # 36 of the MOA states the following:

The defendants will assure that the facility has an adequate number of staff to assure resident safety and fulfill the obligations of this agreement. To achieve this goal, the Implementation Plan will establish a system for determining the appropriate number of staff and the appropriate use of staff time and resources to assure adequate safety for residents and staff and to assure the delivery of programs and services.

The monitor has reviewed the following three studies that have been conducted at CCTJDC:

-Cook County Bureau of Administration - 11/22/04

      -John Howard Association Staffing and Roster Management Report - 3/1/05
      -JHA Staffing and Roster Management Report - 6/30/05

These studies all focused on counselors (direct care staff) and did not include caseworkers or other staff. Each of these studies come to similar conclusions: that the current number of authorized and budgeted counselors are adequate . These conclusions are predicated on: (1) a realignment of shifts (which has been done); (2) increased accountability utilizing technology; (3) continued enforcement of the affirmative attendance policy; and (4) improved scheduling of approved days off ,e g., vacation and personal days.

The new superintendent is currently reviewing these recommendations and is in the process of creating a new roster for counselors.

**POLICY REVIEW AND INPLEMENTATION;**

The defendants Implementation Plan of January 2004 states that a policy driven implementation strategy is the foundation for the MOA IP. It also states that effective detention management must be guided and supported by the development, adoption and implementation of a body of new and revised sound management policies.

The CCJTDC has completed a review and revision of all policies. A master listing of these policies has been developed which includes the section title and number, topic, date completed and signed by the Superintendent, and effective and review dates for each policy.

**YOUTH DISCIPLINE**

MOA paragraphs # 48, 49,50,51,52, and 53 identify the issues of resident discipline. The IP of January 2004 recognized the lack of a formal system to manage a comprehensive system of incentives and sanctions for youth.

A revised policy for Rules and Discipline for residents (numbers 17.1 & 17.2) has been promulgated effective 7/24/05. The new policy contains the relevant MOA provisions except it does not reference or establish the required Disciplinary Practices Review Committee.

There are, however, several deficiencies in the practice that do not comply with the MOA or the new policy. These deficiencies were identified after a review of the monthly Incident Tracking Sheet and a review of the many individual reports and documents. This was supplemented by interviews of each youth in confinement (29 and 27 youth respectively) on two separate days in September 2005.

In September 2005 there were 64 incidents identified on the monthly incident tracking sheet with no reports.. In 148 cases where a report had been written, in 75 (more than half) there is no disposition form indicating a hearing or sanction. Some missing reports were for incidents in the school where limited or no information was communicated to the living unit.

14

The incident reports and discipline disposition forms do not contain information to determine if the four hour requirement for a hearing is being met for youth placed in confinement immediately. This is critical because in almost all incidents where formal discipline is pursued the youth are sent to confinement immediately.

In September 2005 every youth subject to the formal discipline system was found guilty of the charged offense and spent some time in confinement. Interviews with youth indicate that in most cases a caseworker is conducting a hearing but the documentation is lacking as to the time of the hearing. There is no evidence that youth are calling witnesses or have an advocate present.

For the cases with disposition information the confinement time was as follows:

|  |  |
|---|---|
| -48 hours | 2 youth |
| -36 hours | 56 youth |
| -24 hours | 12 youth |
| -18 hours | 2 youth. |

As stated earlier, the required Disciplinary Practices Review Committee has not been appointed and there is no formal review or appeal process in place other than the grievance system.

The forms to document caseworker and medical visits are not adequate to identify who and when they visited. The forms need to identify both medical and casework staff names and title with the date and time of the visit.

**Use of Force and Restraints**

The Center compiles allegations of excessive use of force and has a system to investigate them. The position of Chief Investigator is vacant; therefore these investigations are conducted by floor managers. Although floor managers can and should be part of the process, an independent trained chief investigator is needed.
.
Reviews of incident reports and youth interviews indicate that most uses of restraints were to break up or stop fights. The center uses the Handle with Care behavior management system which operates in a number of detention centers around the country. The following is a summary of reported fights and the number of youth involved over the past several months. The use of non mechanical restraints (PRT) is also included

| MONTH | FIGHTS | RESIDENTS | PRT |
|---|---|---|---|
| April 05 | 84 | NA | 51 |

15

| May 05  | 124 | NA  | 89 |
| ------- | --- | --- | -- |
| June 05 | 29  | 57  | 37 |
| July 05 | 57  | 106 | 69 |
| Aug 05  | 54  | 100 | 78 |

This data have only been summarized and available for these dates. It is commendable and helpful that center staff now compile and distribute this important data. However, the missing information and reports limit the accuracy and utilization. Every effort should be made to improve the collection and reporting .The new center's information system (DIS) has the capacity for report writing on the computer for easy completion and compiling of data and reports. The system is only in use in limited locations and functions ie, intake and reception. The full scale implementation of this system will provide a valuable resource to staff and administration. Training of staff and placement of the computer terminals throughout the facility should be a high priority.

The number of fights and residents involved coupled with the use of physical restraints is a cause for concern. A review of the system for physical restraint should be conducted including the training of staff in its utilization. There have been only five reported uses of mechanical restraints for the above time period.


Respectively submitted


Michael J. Mahoney

**CERTIFICATE OF SERVICE**

  I, Sarah Schriber, an attorney, hereby certify that on the 4th day of October, 2005, I served to the party listed below a true and correct copy of **Notice of Filing and 2005 Monitors' Reports**, pursuant to ECF as to Filing Users under Local Rule 5.5 and by U.S. Mail, postage prepaid, before the hour of 5:00 p.m.


            By:   /s/Sarah Schriber
                One of the Plaintiffs' Attorneys


TO: Michael D. Jacobs
   Patrick Malone Blanchard
   Assistant State's Attorneys
   500 Richard J. Daley Center
   Chicago, Illinois 60602