

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JIMMY DOE, WILLIE ROE, )
JOHNNY WOE, DANNY ZOE, )
CHARLIE ROE, and ANDREW LOE, )
on behalf of themselves and all )
others similarly situated, )
                     )   **No. 99 C 3945**
       **Plaintiffs,** )
                     )   **Hon. John A. Nordberg**
      **v.** )
                     )   **Magistrate Judge Martin C. Ashman**
COOK COUNTY and JERRY )
ROBINSON, Superintendent, )
Cook County Juvenile Temporary )
Detention Center, )
                     )
      **Defendants.** )

FILED
J.N
NOV X 8 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## PETITION TO ENFORCE
## MEMORANDUM OF AGREEMENT

Plaintiffs, by their attorneys, file this Petition to Enforce Memorandum of Agreement

and, in support thereof, state the following:

### I.    Background

1.    The Plaintiffs, children detained at the Cook County Juvenile Temporary

Detention Center ("Detention Center" or "JTDC"), filed this lawsuit on June 15, 1999 seeking

declaratory and injunctive relief under 42 U.S.C. § 1983 for violations of their rights under the

Fourteenth Amendment of the United States Constitution. The Plaintiffs filed their complaint on

behalf of themselves and others similarly situated. On August 4, 1999, this Court appointed

Thomas F. Geraghty as Next Friend to act on behalf of the minor Plaintiffs. On December 22,

1999, this Court certified a class of minor Plaintiffs, defined as persons who have been, are, or

will be detained at the Detention Center.

2.      The Plaintiffs sought to reform a broken institution that for decades had failed to provide constitutionally adequate care and services to children awaiting hearings on delinquency charges. The suit challenged nearly every aspect of institutional operations, programming, and conditions, including overcrowding, unsafe and unsanitary facilities, inadequate medical, dental, and mental health care, physical violence and abuse by residents and staff, unfair discipline, and inadequate access to education.

3.      The principal cause of all of these deficiencies, however, was the gross mismanagement of the Detention Center. Charged with the safety and care of thousands of children each year, the County was operating the Detention Center without even the semblance of a reasonably adequate system to manage daily operations, to ensure the safety of residents or staff, to track critical information about children detained at the facility, and to respond to emergencies. Ultimately, chaos bred neglect, abuse, and violence. *See infra* Sec. II(C).

4.      After extensive discovery and negotiations, the parties settled this class action by entering into a Memorandum of Agreement, approved by this Court pursuant to Rule 23 of the Federal Rules of Civil Procedure in December 2002. *See* Memorandum of Agreement (MOA), attached hereto as **Ex. A**. The Court expressly retained jurisdiction "over the parties and this action to enter any orders necessary or appropriate to enforce, modify or take any other appropriate action with regard to the terms of the agreement." *See* **Ex. B**, Minute Order by Hon. John A. Nordberg dated Dec. 30, 2002.

5.      Nearly three years later, the Defendants have demonstrated again and again that they are unwilling or unable to fulfill their promises to the Plaintiff children and this Court. The Detention Center

- continues to subject the children to high levels of violence, threats, and intimidation, including abuse by other children and even by staff, resulting in

2

> dozens of serious injuries including, among others, broken bones, broken teeth, lacerations that require sutures, bruising, bleeding, and chest pain;
>
> • continues to impose harsh and arbitrary discipline on the children, including rendering them unconscious using dangerous chokeholds and locking them in their cells for days on end for minor infractions;
>
> • repeatedly has failed to implement the most basic systems of management, staffing, and supervision that are necessary to provide a safe environment and adequate services to children.

*See infra* Sec. II. After suffering the consequences of years of neglect and failed promises, the Plaintiffs turn to this Court for relief.

6.     The MOA states that its purpose is "to assure that defendants house residents in an environment that, at a minimum, is safe and clean, is free from excessive and unfair discipline, and provides adequate care and services, including adequate food, shelter, medical services, mental health care, and provides an adequate environment for educational services." **Ex. A**, MOA ¶ 6. Meeting this responsibility requires the defendants "create and maintain a *system* which assures that youth are treated in conformity with the following standards of care:

> (a) Residents shall be reasonably protected from physical and psychological harm;
> (b) Residents shall receive adequate food, shelter, and clothing;
> (c) Residents shall receive adequate appropriate medical, dental and mental health services, including all the services required in the standards cited in this Agreement;
> (d) Residents shall receive appropriate social and recreational programming;
> (e) Residents shall not be subjected to (i) discipline without due process, or (ii) excessive or inappropriate discipline;
> (f) Residents shall be housed and disciplined in the least restrictive way appropriate under the circumstances; and
> (g) The defendants will do everything reasonably within their control to see that residents receive an adequate education.

*Id.* (emphasis added).

7.     Most significant to the Court's consideration of this Petition is the MOA's requirement that the Defendants were required to achieve substantial compliance with the

MOA's substantive requirements of providing adequate care, treatment, services, and housing by *December 2003*, one year after the Court's approval. *See* **Ex. A**, MOA ¶ 9(f) (emphasis added).

8.      The foundation of the MOA is the Implementation Plan. The Implementation Plan must "establish specific tasks, timetables, goals, programs, plans, strategies, and protocols to assure that the JTDC meets the standard of care" required by the MOA. **Ex. A**, MOA ¶ 8. While the MOA initially entrusts the details of the Implementation Plan to the Defendants, it permits the Plaintiffs and the Monitors to challenge the Plan, and, ultimately, to remove the process from the Defendants' sole control by seeking this Court's involvement in determining the Plan's substance. *See* **Ex. A**, MOA ¶¶ 8, 9, 62, 64.

9.      Almost three years after the Court approved the MOA, and two years after the Defendants were required to comply with all of its terms, the Defendants consistently have proven incapable of developing the systems necessary to bring the Detention Center into compliance with standards of care prescribed by the MOA. A clear pattern of noncompliance has emerged and the gross mismanagement that has long characterized the Detention Center has persisted. *See infra* Sec. II.

10.     This petition asks the Court to declare that the Defendants have violated the Memorandum of Agreement, and *inter alia*: (a) to order the Defendants to comply with the provisions set forth in the Memorandum of Agreement; and (b) to appoint a Manager to prepare, for the Court's approval, a new Implementation Plan that, at last, when carried out, will bring the Juvenile Temporary Detention Center into compliance with the MOA.

11.     This Court has the power to issue any order necessary to enforce the Memorandum of Agreement. *See, e.g., In re VMS Securities Litigation*, 103 F.3d 1317, 1321-22 (7th Cir. 1996) (holding district court had jurisdiction to enforce settlement agreement because it

4

had retained jurisdiction over the matter); *Wisconsin Hospital Ass'n v. Reivitz*, 820 F.2d 863, 868 (7th Cir. 1987) (stating that where defendants have violated a valid decree, "the court has the power to issue any order necessary to enforce the decree"). Remedies for violations may take the form of a contempt judgment or, more commonly, as here, a supplementary order to enforce the decree. *See, e.g., Cook v. City of Chicago*, 192 F.3d 693, 695 (more common remedy for violation of consent decree is a supplementary order); *Reivitz*, 820 F.2d at 868 (directing court to enter equitable supplement after defendant violated consent decree). Because the Plaintiffs' primary objective is to bring the Defendants into compliance with the Memorandum of Agreement, not to sanction them for violating it, the Plaintiffs have not yet sought any contempt sanction. However, the Plaintiffs reserve the right to do so.[1]

## II. The Defendants Have Failed Repeatedly to Comply with the MOA.

12.    For the better part of three years, the Plaintiffs and the Monitors have attempted to address the Defendants' ongoing pattern of noncompliance with the MOA. Despite these efforts, the Defendants have been unwilling or unable to remedy the serious deficiencies that riddle the Detention Center.

### A. The Defendants' Pattern of Noncompliance Began with the Failure to Produce an Implementation Plan.

13.    After the Court approved the Memorandum of Agreement, the Defendants were required to develop an Implementation Plan, due on March 30, 2003. *See* **Ex A**, MOA ¶¶ 8-9; Defs.' Implementation Plan, attached hereto as **Ex. C**. The Implementation Plan, the linchpin of the sweeping reform process anticipated by the settlement, was required to establish "specific tasks, timetables, goals, programs, plans, strategies, and protocols," **Ex. A**, MOA ¶ 8, and to

---

[1] In this case, the Court retained jurisdiction "over the parties and this action to enter any orders necessary or appropriate to enforce, modify or take any other appropriate action with regard to the term of the agreement." *See* Minute Order by Hon. John A. Nordberg dated Dec. 30, 2002, attached hereto as **Ex. B.**

include "a description of the rules, protocols, forms, procedures, or other directives which will be used," **Ex. A**, MOA ¶ 9(a). The Implementation Plan is an enforceable supplement to the MOA. *See* **Ex. A**, MOA ¶ 62.

14.     March 30, 2003 came and went, but the Defendants failed to produce a Plan.

15.     In early June 2003, pursuant to the requirements of the MOA (**Ex. A**, MOA ¶¶ 9, 62), counsel for the Plaintiffs notified the Defendants that they were in violation of the MOA and requested a meeting to address the violation. At a meeting in July, at the suggestion of court-appointed Monitors Charles Fasano and Michael Mahoney (the "Monitors"), the Defendants agreed to retain consultants to assist in the formulation of a Plan and to revise their deadlines for completion of the Plan and compliance with the MOA. Many months later, however, the Defendants still had not produced a Plan.

16.     On July 28, 2003, the Monitors produced their first joint monitoring report, assessing the state of the Defendants' compliance with the MOA. *See generally* Report by Michael J. Mahoney and Charles A. Fasano, dated July 28, 2003 (2003 Monitors' Report), attached hereto as **Ex. D**. Not surprisingly, the report noted their "considerable disadvantage in the absence of a completed Implementation Plan" and admonished that "[a] timetable for the submission of an Implementation Plan . . . should be submitted to counsel and the monitors without additional delay." *See id.* at 1. The report concluded that chronic staff vacancies, especially in the critical areas of security, health services, and detention counselors, were causing "extraordinary expenditures on overtime pay and increasing stress on staff" and represented "substantial non-compliance with the Memorandum of Agreement." *See id.* at 4.

17.     By the time of the Monitors' first report, Clara B. Collins, the Superintendent at the Detention Center, had left her post on medical leave and there was no one in charge of the

6

facility on a full-time basis. *See generally* Letter from Benjamin S. Wolf to Michael D. Jacobs dated June 9, 2003, attached hereto as **Ex. E**.

18.     In a September 2003 letter to J.W. Fairman, Chief Coordinator of the Cook County Bureau of Public Safety and Judicial Coordination, Michael Lane, former Director of the Illinois Department of Corrections and one of the consultants hired by the Defendants to assist with the Implementation Plan, stated that the deficiencies at the JTDC "are profound, as shown in the repeated mistaken release of residents . . . a non-existent management response to the alarming rate of staff-on-resident injuries, [and] implementation of new confinement policies in direct violation of the MOA." *See* Letter from Michael P. Lane to J.W. Fairman dated Sept. 10, 2003, attached hereto as **Ex. F**. He concluded

> In talking to a number of senior and line staff, we found that the Center essentially has no working management systems. There is no single, consistent, up-to-date set of policies and procedures governing Center operations, there is considerable confusion over who has authority to issue policy, and there are virtually no reliable means to hold staff accountable to any reasonable standard of operations. . . . In interviews, both managers and line staff were remarkably consistent in describing the Center as lacking fundamental systems of professional management, control, and oversight. More than one person described the facility as a "bomb waiting to explode." In short, the Center as currently managed is not capable of complying with the terms of the MOA and has great potential for embarrassing the County.

*Id.*

19.     On November 17, 2003, the Plaintiffs made a final plea to Defendants to produce an Implementation Plan. *See* Letter from Benjamin S. Wolf to Michael D. Jacobs dated Nov. 17, 2003, attached hereto as **Ex. G**. Met with silence, the Plaintiffs sought relief from the Court. On December 4, 2003, this Court entered and continued the Plaintiffs' Motion to Enforce the Memorandum of Agreement until January 22, 2004. *See* Minute Order by John A. Nordberg, dated Dec. 4, 2003, attached hereto as **Ex. H**.

20.  Finally, on January 20, 2004, nearly ten months after it was due, the Defendants

produced a wholly inadequate document purporting to be the Implementation Plan called for in

the MOA. *See* **Ex. C**, Implementation Plan.

**B.  The Defendants Ignored Their Own Implementation Plan and Failed to
Develop the System of Care Required by the Memorandum of
Agreement.**

21.  The Defendants' Implementation Plan is a catalogue of empty promises.  The

MOA required that the Plan set forth the "specific tasks, timetables, goals, programs, plans,

strategies and protocols" that would "assure that the JTDC meets the standard of care"

established in the MOA. **Ex. A**, MOA ¶ 9(a).  Instead, the Defendants' Implementation Plan for

the most part simply parroted the broad requirements of the MOA, putting off for another day the

real work of revising policies and changing the JTDC's practices regarding hiring, training,

supervision and overall management necessary to create the system of care envisioned by the

MOA. *See* Pls.' Objections to Defs.' Implementation Plan, attached hereto as **Ex. I**.  Nearly two

years after the Implementation Plan and three years after this Court approved the MOA, children

at the JTDC are still waiting for most of the promised reforms even to begin.[2]

Violations of the MOA's Requirements Concerning
Management and Information Systems

22.  The Defendants' persistent failure to implement the most basic management and

information systems lies at the heart of their widespread violations of the MOA.  The Complaint

alleged, and the Plaintiffs' experts confirmed, that the JTDC lacked many of the mechanisms of

---

[2] In light of the overall scope and rudimentary nature of the Defendants' Implementation Plan, the Monitors
suggested that the Defendants initially concentrate on developing systems in the critical areas of (1) discipline; (2)
policy review and implementation; (3) the grievance system; (4) staffing; (5) behavior management; and (6) health
services, before turning to their other obligations under the MOA.  Even in these six areas, the Defendants have
proven to be incapable of complying with the requirements set forth in the MOA. *See generally* Report by Michael
J. Mahoney and Charles A. Fasano, dated July 28, 2003 (2003 Monitors' Report), attached hereto as **Ex. D**; Report
by Charles A. Fasano, dated Sept. 27, 2004, and Report by Michael J. Mahoney, dated Sept. 17, 2004, (together,
2004 Monitors' Report), attached hereto as **Ex. K**; Report by Charles A. Fasano, dated Sept. 30, 2005, and Report
by Michael J. Mahoney, dated Sept. 23, 2005, (together, 2005 Monitors' Report), attached hereto as **Ex. P**.

supervision, oversight and data collection that are essential to managing a large detention facility. *See, e.g.*, Carl V. Sanniti, Expert Opinion of the Conditions of Confinement at the Cook County Juvenile Temporary Detention Center (Nov. 2001) (Sanniti Report), p. 23 ("Many standard detention practices, including basic management practices, have not been adopted."), attached hereto as **Ex. J.** The MOA committed the Defendants to develop a "system of oversight and management" which collects and analyzes basic information about "deficiencies or problems in the care and treatment provided to residents, including injuries, accidents, medical emergencies, discipline or residents and staff, violence, abuse and neglect," and timely addresses and remedies "any and all deficiencies or problems with compliance [with the MOA] that arise." **Ex. A,** MOA ¶ 11.

23.     In their January 2004 Implementation Plan, the Defendants acknowledge that the JTDC did not collect and organize much of the data needed to comply with this provision and that this "lack of effective access to current information" inhibited the development of appropriate practices regarding safety and security management and other key aspects of the facility's operations. *See* **Ex. C,** Implementation Plan.  The centerpiece of the Defendants' proposed solution to this systemic problem was a new, computerized management information system (MIS), promised within 90 days of the Implementation Plan, that would collect and organize data about injuries, accidents, emergencies, discipline of detainees and staff, violence, abuse and neglect. *Id.* at 12. The Defendants announced that they had purchased new computer equipment and software and would begin shortly to produce the required data in a usable form. *Id.*

24.     Like so many of the Defendants' other promises, the MIS described in Defendants' Implementation Plan never became a reality.  For more than a year, the Defendants'

9

failed to produce even the most basic data about incidents and injuries at the JTDC in any form. Then, in June 2005, the Defendants began to provide some very rudimentary information, generated by hand and not the promised MIS, about some of the fights, injuries and allegations of abuse at the JTDC—but this information is so full of gaps, inaccuracies and contradictions that it is of limited value. *See* Report by Charles A. Fasano, dated Sept. 30, 2005, and Report by Michael J. Mahoney, dated Sept. 23, 2005, (together, 2005 Monitors' Report), pp. 8, 12-13 (citing "deficiencies in a significant number of incident and disciplinary disposition reports and discrepancies between incidents listed on monthly tracking sheets and reports contained in monthly packets provided to monitors"), attached hereto as **Ex. K**. Without accurate information about what happens at the facility, the Defendants cannot even begin to develop essential strategies regarding staff assignment and discipline, classification and quality improvement. Nearly three years after approval of the MOA, the Defendants do not come close to complying with the MOA's requirement, or their own promises, of a system of oversight and management grounded in accurate and comprehensive data about what happens to the hundreds of children at the facility.

<u>Failure to Hire Competent and Experienced Management</u>

25.    The Defendants' failure to implement even the most basic management systems is exacerbated by their persistent refusal to hire competent, experienced administrators. The Plaintiffs' experts concluded during discovery that the JTDC's top management lacked the experience and technical knowledge to make the changes necessary to bring the facility into compliance with accepted management standards. *See, e.g.*, **Ex J**, Sanniti Report, pp. 6, 17, 23. The Defendants' own consultant acknowledged two years ago that "the Center as currently managed is not capable of complying with the terms of the MOA and has great potential for

10

embarrassing the County." *See* **Ex. F**, Lane Letter. While the Monitors' and the children detained at the facility waited in vain for the reforms promised by the MOA, however, the Defendants refused even to fill the top job at the facility. Former Superintendent Clara B. Collins lingered on medical leave for a substantial part of two years while the Defendants refused to appoint a successor. When the Defendants finally acknowledged that she would not be returning to the JTDC, the Plaintiffs, at the urging of the Monitors and with the consent of the Defendants' counsel, wrote John Stroger, President of the Cook County Board of Commissioners, urging him to appoint an experienced superintendent to shepherd the difficult changes that were necessary. *See* Letter from Benjamin S. Wolf to John H. Stroger, Jr. dated March 24, 2005, attached hereto **Ex. L**. Instead, after waiting several more months, President Stroger appointed Jerry Robinson to the Superintendent post although he has never worked a single day in a juvenile correctional or detention facility of any kind.

26. After nearly five months, Superintendent Robinson has done little but try to wish away the problems identified by the Monitors and every other expert who has studied the Detention Center. The Plaintiffs waited for some sign that Superintendent Robinson would finally begin the long overdue process of complying with the MOA. The Plaintiffs requested that the Superintendent and his staff present their plans for compliance along with their overall strategies and priorities for the Detention Center and its residents, as part of the Annual Plan required by the MOA to be submitted on September 1, 2005.[3] *See* Letter from Sarah Schriber to Michael D. Jacobs dated Aug. 5, 2005, attached hereto as **Ex. N**. The Plaintiffs also requested

---

[3] The MOA requires the Defendants to complete Annual Plans, due first on March 30, 2003 and then on September 1 of each following year. *See* **Ex. A**, MOA ¶ 61. Annual Plans are intended to describe "in detail the specific actions the defendants will undertake during the following fiscal year and setting forth the actions taken to date to comply with the Implementation Plan and [the MOA]." *Id.* The Defendants produced their first Annual Plan on March 18, 2005, nearly two years after it was due.

that the Defendants submit their Educational Plan, due more than two years before.[4] The Superintendent has produced nothing.

<u>Violations of the MOA's Requirements Concerning Staffing</u>

27. From the line staff to the Superintendent, a lack of adequate staffing has plagued the Detention Center for years prior to the entry of the MOA. Chronic vacancies at an institution like the Detention Center seriously jeopardize the health and safety of both the staff and the children detained there. *See* John Howard Association, Assessment of Conditions at the Cook County Juvenile Temporary Detention Center (May 1998) ("1998 JHA Report"), p. 52, attached hereto as **Ex. O; Ex. J,** Sanniti Report, p. 23.

28. The MOA obligates the Defendants to provide adequate staffing to assure resident safety and to meet their physical and mental health needs. *See* **Ex. A,** MOA ¶¶ 20, 36. In their January 2004 Implementation Plan, the Defendants conceded that they had no system in place to fulfill their obligations under the MOA regarding staffing.[5] *See* **Ex. C,** Implementation Plan, at 29. The Defendants pledged fully to implement both a comprehensive staffing analysis and a roster management system within 90 days of the Plan's acceptance. *Id.* at 30.

---

[4] The MOA also obligated the Defendants to develop a separate Educational Plan, due with the Implementation Plan. *See* **Ex. A,** MOA ¶ 10. The Educational Plan requires the Defendants to provide children housed at the Detention Center with "all the services and programs in their control" including maintenance of an adequate physical facility for education, provision of adequate security, and the opportunity to receive the hours of education mandated by law. **Ex. A,** MOA ¶¶ 6(g), 10. In addition, to ensure that all children receive a minimally adequate education while they are detained, the Defendants are required to appoint an individual to obtain assignments from the school for children not attending school because they are confined to their cells. *See* **Ex. A,** MOA ¶ 49(b)(v).

[5] Six months before the Defendants produced their Implementation Plan, the Monitors reported that a "chronic staffing shortage," demonstrated by 56 vacant Detention Counselor positions and vacancies in food services, custodial staff, and security staff, "has plagued the CCJTDC for a numbers of years and, in the opinion, of the Monitors, represents substantial non-compliance with the Memorandum of Agreement." *See* **Ex. D,** 2003 Monitors' Report, pp. 3-4.

Two months later, the John Howard Association reported that the Detention Center "has experienced frequent changes in upper management positions." Final Monitoring Report, Cook County Juvenile Temporary Detention Center, John Howard Association (Jan. 2004), p. 5, attached hereto as **Ex. T.** Superintendent Clara Collins had left her post on extended medical leave. In addition, at least three of the deputy superintendent positions were vacant, including the position of deputy superintendent for operations. *Id.*

12

29.    The Defendants' deadline passed without their promised staffing analysis or roster management system. *See* Report by Charles A. Fasano, dated Sept. 27, 2004, and Report by Michael J. Mahoney, dated Sept. 17, 2004, (together, 2004 Monitors' Report), pp. 1-2, attached hereto as **Ex. P.** Although the Defendants retained consultants to aid the development of a staffing system, they were charged only with assessing the position of counselor—just a fraction of the overall staffing needs—and remained in the "very preliminary phase" of that work by the end of 2004. *Id.* at 2.

30.    The defendants have never complied with the staffing components of the MOA. Last month, the Monitors reported that "[d]uring the past twelve to eighteen months, there have been numerous instances in which a number of essential positions—including Detention Counselors, nurses, mental health staff, and investigative staff—have remained vacant for lengthy periods, which has affected security, supervision of youth, health services and other programs." **Ex. K**, 2005 Monitors' Report, p. 2. Although recent studies demonstrate that as many as 65 percent of boys and 70 percent of the girls detained at the JTDC suffer with diagnosable mental illnesses,[6] for example, the Detention Center's capacity to provide adequate mental health services is severely compromised by staffing shortages. *Id.* at 4. The Monitors caution that the "chronic failure to fill many positions at the CCJTDC in a genuinely timely fashion continues to impede efforts to enhance security and supervision and provide the range of programs and services required by the MOA." *Id.* at 2.

    **C.**    **The Defendants' Continuing Violations of the Memorandum of Agreement Endanger the Safety of the Children Housed at the Detention Center.**

---

[6] *See, e.g.*, Karen M. Abram, PhD et al., *Comorbid Psychiatric Disorders in Youth in Juvenile Detention*, 60 Arch. Gen. Psychiatry 1097 (Nov. 2003), attached hereto as Ex. Q.

31.     The Defendants' failure to establish a system of care that meets the basic requirements of the MOA jeopardizes the safety of the children housed at the Detention Center and subjects them to harsh and arbitrary punishment.

Violations of the MOA's Requirements Concerning Abuse,<br>Neglect and Safety

32.     The pattern of violence and abuse at the JTDC was a central allegation in this Plaintiffs' Complaint. *See* **Ex. A**, MOA, p.2. The Defendants agreed in the MOA to assure safe conditions and to prohibit abuse, neglect and the inappropriate or unnecessary use of force. *See* **Ex. A**, MOA ¶¶ 6(a), 7(a), 25, 35, 49(a), 56, 59. The Defendants acknowledged in their Implementation Plan that "[t]he JTDC has failed to maintain adequate control and security within the facility," and that various reports "document high levels of violence, threats, and intimidation among the detainee population." *See* **Ex. C**, Implementation Plan, at 140. The Plan promised a complete revision of existing policies and regulations, under the supervision of a new Security Procedures Review Committee, and a variety of other measures, including the creation of specialized units to protect particularly vulnerable residents. *See id.*, at 141-43, 153-54.

33.     Today, the JTDC remains a frightening and violent environment for children. The Defendants' own reports in recent months reveal numerous allegations of neglect and physical abuse by staff, yet the Monitors report that the Chief Investigator position, the staff person who would investigate these allegations and act to correct them, remains vacant. *See* Defs.' Monthly Unusual Incident Report Summaries, attached hereto as **Group Ex. R**; **Ex. K**, 2005 Monitors' Report, p. 3.

34.     The Defendants also acknowledge that the children have endured hundreds of fights and dozens of injuries in recent months, some of them requiring hospital treatment. *See* **Ex. R**, Unusual Incident Report Summaries. Published reports suggest that these reported

14

incidents are just the tip of the iceberg. *See* Reports Regarding the Detention Center, attached hereto as **Group Ex. M**. The Plaintiffs recent interviews of dozens of children indicate widespread violence and threats of violence, and that staff continue to use dangerous chokeholds, a restraint technique that is explicitly prohibited by the MOA. *See* **Ex. A**, MOA ¶ 57; Affidavit of Thomas F. Geraghty (Geraghty Affidavit), attached hereto as **Ex. S**. Yet the Defendants have not reported the results of a single meeting of the Security Procedures Review Committee, and even relatively simple reforms, such as establishing "protective custody" units for especially vulnerable youngsters, remain only at the planning stage. *See* **Ex. K**, 2005 Monitors' Report, p. 5 (stating that youth with "special psychiatric needs" continue to be housed in many different living units, a practice which "in all likelihood contributes to the substantial number of incidents and other behavior problems displayed by these juveniles").

Violations of the MOA's Requirements Concerning Discipline

35.     The arbitrary and harsh discipline of children detained at the Juvenile Temporary Detention Center has long been business as usual. More than five years ago, experts inspecting the Detention Center condemned its practices of confining youth to locked rooms for lengthy periods of time as punishment for minor incidents, failing to hold due process reviews before imposing disciplinary confinement, and failing to ensure that youth held in disciplinary confinement received exercise or educational services. *See* John Howard Association, Assessment of Conditions at the Cook County Juvenile Temporary Detention Center (May 1998) ("1998 JHA Report"), p. 170, attached hereto as **Ex. O**; **Ex. J**, Sanniti Report, p. 23.

36.     The MOA requires the Defendants to ensure that "all discipline is carried out in a manner that is safe, fair, and consistent" and to adopt policies and procedures that make certain that any discipline "meted out is an appropriate and measured response to the behavior it

addresses." **Ex. A,** MOA ¶ 48. In their Implementation Plan, the Defendants acknowledged that

"historically, the Center staff have relief upon the use of force and room confinement to respond

to detainee behavior issues" and that "[t]his practice has been ineffective and places detainees at

risk to undue and unfair discipline." *See* **Ex. C,** Implementation Plan, at 113. To comply with

the requirements of the MOA, the Defendants vowed to convene a Disciplinary Practices Review

Committee to oversee the development and implementation of a comprehensive disciplinary

system, which would be fully implemented within five months. *Id.* at 118-19.

37.     The Disciplinary Practices Review Committee, if it convened at all, never

produced the promised reforms, and to this day the Defendants have never complied with the

MOA's requirements regarding youth discipline. *See* **Ex. P,** Monitors' 2004 Report, p. 3

(criticizing the Defendants discipline practices, including the use of room confinement as the

exclusive form of punishment and a lack of administrative review). Last month, the Monitors

reported continuing "deficiencies in the practice [of resident discipline] that do not comply with

the MOA." **Ex. K,** 2005 Monitors' Report, p.12. The Monitors' revealed that every youth

recommended for formal discipline was found guilty and received immediate room confinement,

often without due process, and that there was no meaningful administrative review of decisions

by low-level staff to lock children alone in their rooms for lengthy periods of time. *See id.*

38.     Despite the efforts of the Plaintiffs and Monitors for nearly three years, the

Defendants have demonstrated again and again that they are unable to comply with the terms of

the MOA. The ongoing mismanagement and incompetence of those employed at the Detention

Center, and the chaos that ensues, result in harm to the children who have no choice but to stay

there. As revealed to counsel in dozens of interviews since December 2003 with children living

at the Detention Center, among the children placed in room confinement, most of them were kept

there for at least 36 hours and many for longer. While confined to their rooms, children report that often they are not permitted to take showers or get exercise. They are never permitted to do homework. Even more startling, most of the children interviewed report having witnessed staff punch, kick, or slap residents, or have experienced this type of inappropriate treatment themselves. Finally, nearly half of the children interviewed report that they have experienced or witnessed staff using chokeholds, a dangerous practice prohibited by the MOA. *See* **Ex. S**, Geraghty Affidavit.

39.    As told to counsel for the Plaintiffs, in one instance, a youth counselor kicked a resident in the mouth, knocking out his front teeth. In another instance, a male youth counselor granted a female resident permission to enter her locked cell, but when she refused to remove her shoes before going inside, he grabbed her from behind, wrapped his arm around her neck, walked with her into her cell, and closed the door. Inside, alone with the resident, the youth counselor continued the chokehold and then struck her in the face. In a third instance, a resident revealed that his youth counselor punched him in the face and kicked him in the lower back. Despite the fact that his face became badly infected and ultimately required hospitalization, it took several days before the resident received any treatment at all. Incidents like these occur with regularity at the Detention Center.

40.    The harms children experience at the Detention Center result directly from the Defendants' inability to develop and implement the systems essential to managing daily operations, ensuring the safety of residents and staff, and delivering the services required by the MOA. Renewed promises to advance the reform process are no longer credible. The Defendants have demonstrated for three years that their hollow promises are as much as part of the pattern of noncompliance as their failures to follow through with them.

17

### III.    Request for Relief

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)    Declare that the Defendants have violated the MOA;

(2)    Order the Defendants to come into substantial compliance with all of the terms of the MOA within six (6) months of the Court's order;

(3)    Appoint an independent Manager with expertise in juvenile correctional planning and administration to prepare within 60 days of the Court's order an Implementation Plan that complies with the MOA by establishing specific tasks, timetables, goals, programs, plans, strategies, and protocols to assure that within six (6) months, the Detention Center meets prescribed standards of care. In doing so, the Manager shall consult with the Monitors and the parties and retain additional experts as necessary. The Manager shall have the same authority guaranteed to the Monitors by paras. 60 and 64 of the MOA regarding access to the Detention Center staff, residents, facility, and documents. The Court shall assign any additional duties to the Manager necessary to ensure compliance with the Implementation Plan and the MOA;

(4)    Order the Monitors to assess completely all phases of the Defendants' compliance with the Implementation Plan and the MOA and to file reports with this Court, the Manager, and the parties every 45 days following the Court's approval of the Manager's Implementation Plan;

(5)    Order Defendants to compensate the Manager, and any experts he or she may retain, at their usual and customary rate, for their work on this matter and to reimburse them for all reasonable expenses;

(6)    Permit discovery regarding the matters raised in this Petition;

(7)    Set this Petition for hearing within 45 days; and

(8)    Award any additional relief that this Court may determine to be appropriate.

Respectfully submitted,

_____
One of the Plaintiffs' attorneys

HARVEY GROSSMAN
BENJAMIN S. WOLF
SARAH SCHRIBER
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
312-201-9740

BARRY F. IRWIN
ALEXANDER DIMITRIEF
COLBY KINGSBURY
RAMYA RAVINDRAN
Kirkland & Ellis
200 E. Randolph
Chicago, IL 60601
312-861-2000

**CERTIFICATE OF SERVICE**

I, Benjamin S. Wolf, hereby certify that I served a copy of **PLAINTIFFS'**

**PETITION TO ENFORCE MEMORANDUM OF AGREEMENT** via messenger

before 5:00 p.m. on November 8, 2005 to:


Michael D. Jacobs
Assistant State's Attorney
500 Daley Center
66 West Washington
Chicago, IL 60602


Benjamin S. Wolf