**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JIMMY DOE, WILLIE ROE,** | ) | |
| **JOHNNY WOE, DANNY ZOE,** | ) | |
| **CHARLIE ROE, and ANDREW LOE,** | ) | |
| **on behalf of themselves and all** | ) | |
| **others similarly situated,** | ) | |
| | ) | |
| | ) | **No. 99 C 3945** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | **Hon. John A. Nordberg** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Martin C. Ashman** |
| **COOK COUNTY and ROBERT** | ) | |
| **CATCHINGS, Acting Superintendent,** | ) | |
| **Cook County Juvenile Temporary** | ) | |
| **Detention Center,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF
<u>MOTION FOR APPOINTMENT OF RECEIVER</u>**

# TABLE OF CONTENTS

I.      Introduction ................................................................................................1

II.     The Defendants Repeatedly and Flagrantly Have Violated this Court's
        Orders .........................................................................................................5

        A.      The Defendants' Violations of the 2002 MOA .........................................5

        B.      The Defendants' Violations of the 2006 ASO .........................................7

                1.      Cook County has systematically stripped the JTDC of essential
                        personnel necessary to comply with the MOA. ...............................8

                2.      The defendants will not bring the JTDC into compliance with the
                        MOA. ..........................................................................................11

III.    Argument ..................................................................................................13

        A.      Receivership Is the Only Remedy that Will Ensure Compliance with the
                Court's Orders to Reform the Care and Conditions at the JTDC. .........13

        B.      The Plaintiffs Have Exhausted the Remedies Available to Them Under the
                MOA. ..........................................................................................19

IV.     Relief Requested .......................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Benjamin v. Fraser*,
    343 F.3d 35 (2d Cir. 2003)................................................................. 13

*Dixon v. Barry*,
    967 F. Supp. 535 (D.D.C. 1997) ................................................ 14, 16, 17, 18

*Duran v. Elrod*,
    713 F.2d 292 (7th Cir.1983) ............................................................ 13

*Gary W. v. State of Louisiana*,
    No. 74-2412 1990 WL 17537 (E.D. La. Feb. 26, 1990)..................................... 18

*Gautreaux v. Dept. of Housing and Urban Development and Chicago Housing Authority*,
    69 C 1459/69 C 1460 (N.D. Ill. Aug. 14, 1987) .......................................... 18

*Green v. County School Bd.*,
    391 U.S. 430 (1968)..................................................................... 16

*LaShawn A. v. Kelly*,
    887 F. Supp. 297 (D.D.C. 1995) ........................................................ 18

*Missouri v. Jenkins*,
    495 U.S. 33 (1990)...................................................................... 13

*Morgan v. McDonough*,
    540 F.2d 527 (1st Cir. 1976) ....................................................... 14, 18

*Newman v. State of Alabama*,
    466 F. Supp. 628 (M.D. Ala. 1979) ..................................................... 18

*People Who Care v. Rockford Bd. of Educ. School Dist.*
    *No. 205*, 171 F.3d 1083 (7th Cir. 1999)................................................ 13

*Perez v. Boston Housing Authority*,
    400 N.E.2d 1231 (Mass 1980) ........................................................... 18

*Plata v. Schwarzenegger*,
    No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005.).......................... passim

*Shaw v. Allen*,
    771 F. Supp. 760 (S.D.W. Va. 1990)............................................... 14, 17, 18

*South Suburban Housing Ctr. v. Berry*,
    186 F.3d 851 (7th Cir. 1999) .......................................................... 13

ii

*Thompson v. United States Dep't of Housing & Urban Development*,
    404 F.3d 821 (4th Cir. 2005) ........................................................................................ 13

The Court's appointed Next Friend, Professor Thomas Geraghty, and the young residents detained at the Cook County Juvenile Temporary Detention Center, through their counsel, respectfully request that this Court appoint a Receiver to ensure compliance with the mandates of the Memorandum of Agreement (MOA), and the Agreed Supplemental Order (ASO), entered by the Court in this action.

## I.    Introduction

This case has reached a crossroads.  As the Next Friend has stated in his Motion for Appointment of Receiver, the young residents, whose rights this Court appointed him to safeguard nearly eight years ago, continue to be housed in dangerous conditions and provided with profoundly inadequate services.  It is now clear that, so long as the defendants remain in control of implementing the Court's orders at the Juvenile Temporary Detention Center (JTDC), little will change.

Since signing onto the MOA (appended hereto as Ex. A)[1] and committing to make scores of improvements to bring the JTDC up to constitutional standards in December 2002, the defendants repeatedly and flagrantly have disregarded this Court's orders and their own promises.  The defendants' violations continue to harm the health and safety of the residents at the JTDC.  Today, these young residents face:

- **An alarming risk of suicide and inadequate mental health services**. Months ago, the Court Monitors' psychiatric expert, Dr. Louis Kraus, reported that suicidal and other mentally ill youth at the JTDC were at imminent risk of physical harm unless steps were taken quickly to improve mental health services.[2]  The defendants largely have ignored those findings.  More than half of the essential positions for mental health

---

[1] Each exhibit cited herein is being filed separately but concurrently herewith.

[2] *See* Louis J. Kraus, M.D., Psychiatric Update (Feb. 15, 2007) at 1, appended hereto as Ex. F.

staff remain vacant.[3]  Staff routinely fail to conduct 15-minute checks to ensure the safety of residents locked in their cells[4] or to alert mental health professionals when residents attempt suicide.[5]

- **A climate of fear and violence**.  The young residents at the JTDC are subjected to physical abuse by staff and other residents on a regular basis, yet employees who assault residents are returned to duty, mandated training is not completed, the JTDC fails to report allegations of abuse to state authorities as required by law, and the County repeatedly has violated its own promises to hire staff to investigate and discipline abusive personnel.[6]

- **Inadequate medical services**.  JTDC residents regularly do not receive necessary screenings, medication and other services, seriously jeopardizing their health.[7]  The facility's accreditation recently was revoked.[8]

- **A persistent failure to provide basic necessities, subjecting residents to unsafe and unsanitary conditions**.  Residents are forced to wear dirty

---

[3] *See* April 2007 Report of Compliance Administrator (May 17, 2007) (the "Apr. 2007 Compliance Rep.") at 2, 27-28, 62, appended  hereto as Group Ex. B.

[4] *See, e.g.*, Group Ex. B, Apr. 2007 Compliance Rep. at 9, 34, 76; March 2007 Report of Compliance Administrator (Apr. 13, 2007) (the "Mar. 2007 Compliance Rep.") at 8-10, 29-30, appended hereto as Group Ex. B; February 2007 Report of the Compliance Administrator (Mar. 15, 2007) (the "Feb. 2007 Compliance Rep.") at 4-5, 23-24, appended hereto as Group Ex. B; January 2007 Report of Compliance Administrator (the "Jan. 2007 Compliance Rep.") at 3, appended hereto as Group Ex. B.

"Fifteen-minute checks" refer to the visual check a staff person is required to perform every fifteen minutes of any resident who is locked in his cell.  Fifteen-minute checks, which are considered essential to assure the safety of the residents locked in their cells, are required by the MOA.  *See* Ex. A, MOA 49.

[5] *See, e.g.*, Group Ex. B, Apr. 2007 Compliance Rep. at 3; Group Ex. B, Jan. 2007 Compliance Rep. at 1; Report of Compliance Administrator (Jan. 30, 2007) (the "Jan. 30, 2007 Rep.") at 1-2, appended hereto as Group Ex. B; Report of Compliance Administrator (July 15, 2006) (the "July 15, 2006 Rep.") at 10, appended hereto as Group Ex. C.

[6] *See, e.g.*, Group Ex. B, Apr. 2007 Compliance Rep. at 4-5, 19-20; Group Ex. B, Mar. 2007 Compliance Rep. at 3-5, 16-17; Group Ex. B, Feb. 2007 Compliance Rep. at 2-3, 10-11; Jan. 2007 Compliance Rep. at 2; *see generally* Recommendation of Compliance Administrator (Sept. 25, 2006), appended  hereto as Group Ex. D.

[7] *See, e.g.*, Group Ex. B, Apr. 2007 Compliance Rep. at 2, 31, 55, 59; Group Ex. B, Mar. 2007 Compliance Rep. at 26, 53; Group Ex. B, Feb. 2007 Compliance Rep. at 21, 41; Report of Compliance Administrator (Oct. 10, 2006) (the "Oct. 10, 2006 Compliance Rep.") at 5, appended  hereto as Group Ex. C.

[8] *See* Group Ex. B, Apr. 2007 Compliance Rep. at 1.

2

underwear and socks for days on end.[9] Living units are filthy and infested with rodents.[10] Dangerous chemicals are frequently accessible to residents.[11] Recently, several residents were unable to attend school because the JTDC could not supply them with shoes.[12]

- **A culture of chaos and incompetence**. Staff routinely sleep on duty, are absent from work and ignore (or are never made aware of) JTDC policies.[13] There is no coherent chain of command and no effective discipline of staff who are incompetent or negligent.

- **A refusal to implement proven methods of management and oversight**. The JTDC has not developed basic financial controls, employment practices, policymaking, training, data tracking and assessment, roster management, roll call, or oversight mechanisms.[14]

The deficiencies that plague the JTDC are well known, yet little has improved and, in many instances, conditions have deteriorated.[15] The court-appointed Compliance Administrator

---

[9] *See, e.g.*, Group Ex. B, Apr. 2007 Compliance Rep. at 12-13, 47-48, 83-84; Group Ex. B, Mar. 2007 Compliance Rep. at 10-11, 41-42; 80-81; Group Ex. B, Feb. 2007 Compliance Rep. at 6, 31-32; Group Ex. B, Jan. Compliance Rep. at 3.

[10] *See, e.g.*, Group Ex. B, Apr. 2007 Compliance Rep. at 47-48; Group Ex. B, Feb. 2007 Compliance Rep. at 32; Group Ex. B, Jan. 2007 Compliance Rep. at 19.

[11] *See, e.g.*, Group Ex. B, Apr. 2007 Compliance Rep. at 48; Group Ex. C, Oct. 10, 2006 Compliance Rep. at 8.

[12] *See* Group Ex. B, Apr. 2007 Compliance Rep. at 13, 30.

[13] *See, e.g.*, Group Ex. C, Oct. 10, 2006 Compliance Rep.; Group Ex. C, July 15, 2006 Rep. at 6-7.

[14] *See, e.g.*, Group Ex. B, Apr. 2007 Compliance Rep. at 5, 8, 27, 41-43, 64; Laura A. Berman, Cook County Auditor, Audit of Financial Operations at the Cook County Juvenile Temporary Detention Center (May 8, 2007) (the "Financial Audit"), appended hereto as Group Ex. G.

[15] The JTDC has been investigated, studied, and assessed dozens of times, since before the plaintiffs filed this case in 1999.

This Court's Compliance Administrator has reported monthly on the problems at the JTDC since her appointment in May 2006. *See generally* April 2007 Report of the Compliance Administrator (May 17, 2007); March 2007 Compliance Report of the Compliance Administrator (Apr. 13, 2007); February 2007 Report of the Compliance Administrator (Mar. 15, 2007); January 2007 Report of the Compliance Administrator (Feb. 15, 2007); Report of the Compliance Administrator (Nov. 1, 2006), appended hereto as Group Ex. B. *See also* Oct. 10, 2006 Compliance Rep.; Report of the Compliance Administrator (Sept. 3, 2006); Report of the Compliance Administrator (Aug. 15, 2006); Report of the Compliance Administrator (Aug. 1, 2006); Report of the Compliance Administrator (July 15, 2006); Report of the Compliance Administrator (June 30, 2006), redacted versions appended hereto as Group Ex. C. The Compliance Administrator also has submitted numerous written recommendations to the defendants. *See* generally Recommendations of the Compliance Administrator (May 17, 2007); Recommendations of the Compliance Administrator (Mar. 12, 2007); Recommendations of the

(Continued…)

and Monitors, the Next Friend, and counsel for the plaintiffs, have attempted time and time again

to persuade a constantly changing parade of politically-connected officials and administrators to

address the serious problems at the facility. However, the defendants refuse to confront the

Compliance Administrator (Mar. 8, 2007); Recommendations of the Compliance Administrator (Feb. 25, 2007); Recommendations of the Compliance Administrator (Feb. 15, 2007); Recommendations of the Compliance Administrator (Feb. 14, 2007); Recommendations of the Compliance Administrator (Jan. 30, 2007); Recommendations of the Compliance Administrator (Sept. 25, 2006); Recommendations of the Compliance Administrator (July 10, 2006), appended hereto as Group Ex. D.

This Court's Monitors also have reported on the JTDC since the MOA was entered in late 2002. *See generally* Report and Recommendations of the Court Monitor Charles A. Fasano (Mar. 2, 2006); Report of Court Monitor Charles A. Fasano (Sept. 30, 2005); Report of Court Monitor Michael J. Mahoney (Sept. 23, 2005); Report of Court Monitor Charles A. Fasano (Sept. 27, 2004); Report of Court Monitor Michael J. Mahoney (Sept. 17, 2004); Report of Court Monitors (July 28, 2003), appended hereto as Group Ex. E.

In addition, since this case was filed in 1999, a multitude of local and national expert consultants have inspected all aspects of the JTDC and repeatedly identified myriad deficiencies. *See* Dr. Louis J. Kraus, M.D., Psychiatric Update of the Memorandum of Agreement/Agreed Supplemental Order/Modified Implementation Plan of January 3, 2007 (Feb. 15, 2007); Robert E. Morris, M.D., Report Concerning the Status of Health Care, Chicago Juvenile Detention Facility (CCJTDC) (Mar. 17, 2006); Louis J. Kraus, M.D., Report on Mental Health Services, Cook County Juvenile Temporary Detention Center (Mar. 9, 2006); Carl V. Sanniti, Expert Opinion of the Conditions of Confinement at the Cook County Juvenile Temporary Detention Center (Nov. 2001); Michael D. Cohen, M.D., Report on Medical and Dental Services, Cook County Juvenile Temporary Detention Center (Oct. 27, 2000); James J. Balsamo, Environmental health and Safety Inspection of the Cook County Juvenile Detention Center (Feb. 6, 2000), appended hereto as Group Ex. F.

Finally, a number of organizations and consultants have studied the JTDC. *See, e.g.*, Laura A. Berman, Cook County Auditor, Audit of Financial Operations at the Cook County Juvenile Temporary Detention Center (May 8, 2007); John Howard Association, Report and Recommendations of the Special Committee on the Cook County Juvenile Temporary Detention Center (Mar. 28, 2007); Report of the Chicago Bar Association Blue Ribbon Committee on the Cook County Juvenile Temporary Detention Center (Jan. 11, 2007); John Howard Association, An Association Report: Volunteer Visit to the Cook County Juvenile Temporary Detention Center 23 Aug 2006 (Oct. 2006); Illinois Department of Corrections, Cook County Juvenile Temporary Detention Center 2006 Inspection Addendum (Sept. 14, 2006); National Commission on Correctional Healthcare, Accreditation Report (NCCHC) (Feb. 24, 2006); Juvenile Detention Alternative Initiative Self-Assessment Team, JTDC Self-Assessment Report (Jan. 25, 2006); John Howard Association, An Association Report: Visits to the Cook County Juvenile Temporary Detention Center 2001-2005 (Jan. 2006) (the "JHA 2006 Rep."); Cook County Juvenile Temporary Detention Center Staffing and Roster Management Assessment, submitted to the John Howard Association (June 30, 2005); Cook County Juvenile Temporary Detention Center Staffing and Roster Management Assessment, submitted to the John Howard Association (Mar. 1, 2005); James L. Eldridge, Jr., Chief Administrative Office, Cook County Bureau of Administration, JTDC Payroll and Overtime Analysis (Nov. 22, 2004); (NCCHC), Accreditation Report of the Health Care Services at the Cook County Juvenile Temporary Detention Center (June 25, 2004); John Howard Association, Final Monitoring Report, Cook County Juvenile Temporary Detention Center (Jan. 29, 2004); U.S. Dept. of Justice, Survey on Sexual Violence in Locally or Privately-Owned Juvenile Facilities (2004); John Howard Association, Assessment of Conditions at the Cook County Juvenile Temporary Detention Center June 1998—October 2000 (Nov. 8, 2000); John Howard Association, Assessment of Conditions at the Cook County Juvenile Temporary Detention Center (May 1998), appended hereto as Group Ex. G.

4

patterns of patronage and incompetence that lie behind so many of the JTDC's historic problems. It has become increasingly clear that the defendants will never comply with the MOA or with the ASO, approved last year in an unsuccessful attempt to secure compliance with the MOA. Therefore, the plaintiffs respectfully urge this Court to appoint a Receiver with the authority to bring the JTDC, at long last, into compliance with the MOA and the ASO.

## II.  The Defendants Repeatedly and Flagrantly Have Violated this Court's Orders

This Court has given the defendants ample opportunity to improve care and services at the JTDC, but they have refused to change.  Instead, the County and the JTDC's administrators have resisted, undermined, and even rejected the assistance offered them.

### A.  The Defendants' Violations of the 2002 MOA

From the beginning of the reform process, the defendants have lacked the capacity and the commitment to direct the effort successfully.  The hope for reform that accompanied the Court's approval of the MOA in December 2002 was quickly dashed.  The first and most basic requirement of the MOA was that the defendants craft a detailed Implementation Plan (the "Plan"), describing the specific steps they would take to bring about the mandated reforms.  *See* Ex. A, MOA ¶ 8.  Months dragged by with no evidence that the Plan even was being considered. Staff's sole effort to draft the Plan was so inadequate that J.W. Fairman, the County's top correctional official, later admitted he threw it in the garbage.  Deposition of J.W. Fairman, Jr. (Dec. 6, 2005) at 41, excerpt appended hereto as Ex. H.

At the urging of the Monitors, the defendants announced that they had hired outside consultants to write the Plan, but more time passed and no plan was forthcoming.  Finally, weeks after the plaintiffs filed a motion with this Court seeking an order forcing the defendants to produce the Plan, the defendants presented the consultants' Plan.  It soon became clear, however, that the same officials who were unable to draft the Plan in the first instance had little idea how

to comply with the consultants' Plan.[16]  *See generally* Modified Implementation Plan (the "MIP") at 102-03 n.6, 104 (discussing the inability of the JTDC leadership and staff to follow the Plan), appended hereto as Ex. I.

For over a year, despite regular meetings with the Monitors and plaintiffs, the defendants floundered, failing to make even the most basic improvements.  The critical leadership functions of the absentee superintendent were assumed by a series of temporary superintendents, including Mr. Fairman, who also retained his full-time, executive-level post in downtown Chicago with the County's Bureau of Public Safety.  No one knew which official had authority over key management functions.  Without any real leadership, morale plummeted and staff operated with virtually no supervision.[17]

At the request of the Monitors and with the consent of the defendants' counsel, the plaintiffs wrote John Stroger, then President of the Board of Commissioners, urging the County to appoint an experienced, independent superintendent who could shepherd the difficult changes that were necessary.  *See* Letter from Benjamin S. Wolf to John H. Stroger, Jr. (Mar. 24, 2005), appended hereto as Ex. J.  The Monitors recommended to President Stroger several candidates with the requisite experience, but each was rejected.  Instead, President Stroger appointed Jerry Robinson whose political connections and lack of relevant experience sent a strong message about the defendants' true intentions.  *See* Ex. I, MIP at 102 n.6.  To make matters worse, County

---

[16]  One observer reports that by April 2002, the JTDC's administration was in "complete disarray."  Group Ex. G, JHA 2006 Rep. at 3.  By summer of 2003, there was a "significant vacuum in experienced leadership at the Detention Center," which was exacerbated when a new assistant superintendent was named "without any experience in adult or youth corrections."  *Id.*  By December 2003, the situation had grown even worse and "control over the Detention Center seemed to be deteriorating."  *Id.*

[17]  *Id.*  Mr. Fairman, for example, acknowledged that as of December 2005 staff had not received annual performance evaluations for many years.  *See* Ex. K, Excerpt of Deposition of J.W. Fairman, Jr., (Dec. 7, 2005), at 209-10.

officials then appointed three assistant superintendents whose complete lack of qualifications reflected the County's total inability to implement Court-ordered change.

Nearly three years into the implementation of the MOA, the defendants demonstrated virtually no progress. There was no management information system, staff roster, roll call, or other mechanisms to communicate important information from top officials to staff or even from one shift to the next. *See* Ex. I, MIP at 115-16 (discussing lack of a management information system to collect data); *see* also Group Ex. B, Apr. 2007 Compliance Rep. at 5 (noting that there is still no such system). There was no system in place to investigate properly or hold accountable staff who mistreated the young residents or who encouraged residents to fight with each other. Medical and mental health services had deteriorated to the point of endangering youth who desperately needed these services. What little progress had been made, including the short-lived accreditation of the medical department,[18] could not be sustained.

### B. The Defendants' Violations of the 2006 ASO

Having repeatedly attempted to address the defendants' litany of violations in a collaborative manner without success, the plaintiffs filed a Petition to Enforce the Memorandum of Agreement in November 2005. After extensive discovery and mediation, the Court entered the ASO (appended hereto as Ex. L), a second enforceable agreement incorporating the MOA, which empowered a panel of agreed experts to work with the Monitors and develop a new, enforceable Modified Implementation Plan (MIP) and appointed a Compliance Administrator

---

[18] After its April 2004 accreditation, NCCHC put the JTDC on probationary status in February 2006. See Group Ex. B, Apr. 2007 Compliance Rep. at 1. To be taken off probation, NCCHC demanded that the JTDC improve policies and procedures in eleven areas by November 2006. As of November 15, 2006, however, the JTDC had not made the necessary improvements. NCCHC withdrew accreditation in March 2007. *Id.*

with unfettered access to the JTDC to oversee the efforts to comply with the MOA. The Court, at the suggestion of both parties, selected seasoned correctional expert Brenda Welch.

The Monitors approved the experts' MIP in January 2007. The MIP described the specific actions that would be necessary to bring the JTDC into compliance with the MOA by July 15, 2007. *See generally* Ex. I, MIP. The MIP stated clearly that the defendants' previous attempts to comply with the MOA failed "because of missing or omitted factors, most notably leadership." *Id.* at 96. It cautioned that if the defendants continued to resist placing competent individuals into the facility's top leadership positions, the chances of reform would be slim. *Id.*

Instead of embracing this second chance, the defendants blatantly have violated nearly every benchmark mandated by the MIP and fallen far short of meeting the requirements of the MOA. The Compliance Administrator's most recent report to this Court makes clear that, four months into the six-month plan, "little progress" has been made to comply with the MOA and the likelihood of further progress is "limited." See Ex. M, Cover Letter, Apr. 2007 Compliance Rep. at 2. As foretold, the JTDC remains a mismanaged, dangerous institution.

               1.    <u>Cook County has systematically stripped the JTDC of essential personnel necessary to comply with the MOA.</u>

If there were ever any doubt about the defendants' intentions, their recent personnel decisions have made crystal clear that their priority is patronage and politics and that they have no intention of even attempting to comply with this Court's orders. In the past few months, the defendants have terminated the very employees whose work is essential to reform while hiring and continuing the employment of individuals who know nothing about how to run a juvenile detention facility.

Last fall, for example, the defendants hired Carl Sanniti as an Assistant Superintendent of the JTDC. Mr. Sanniti is a nationally-known expert in juvenile detention administration who had

served as one of this Court's appointed experts crafting the MIP. After Mr. Sanniti had begun working to improve the JTDC's intake procedures, behavior management and programming, the County abruptly terminated his position without cause or notice in its most recent budget. *See* Group Ex. B, March 2007 Report of Compliance Administrator (Feb. 15, 2007) (the "Mar. 2007 Compliance Rep.") at 18. Instead, the County retained Maria Moreno-Safarcyk, as a highly paid executive who has no experience in juvenile detention or corrections and apparently has done nothing to advance compliance with the MIP, but is the sister of a County Commissioner.

Mr. Sanniti's abrupt termination is just one example of the way the defendants have stripped the facility of key personnel who were essential to reform. The County also had assigned Dr. Michael Puisis, then Senior Physician at the County's Cermak Health Services, the lead role overseeing reforms in health and mental health services at the JTDC. *See* Group Ex. B, Report of Compliance Administrator (Nov. 1, 2006). Dr. Puisis spent months meeting with this Court's appointed mental health and medical experts, the Monitors, the Compliance Administrator, and many others, to craft the medical and mental health provisions in the MIP. Dr. Puisis was in the final stages of formulating a detailed plan to bring the JTDC into compliance with the MOA's provisions with respect to these essential services when the County, without notice, terminated his employment, throwing these critical services into disarray. Dr. Puisis' termination, together with repeated and inexplicable delays securing Cook County Board approval for a contract with an outside provider, which the monitors and the parties agreed was essential for the JTDC to provide adequate mental health services, doomed any chance of compliance with the MIP's provisions concerning mental health services. *See generally* Ex. F, Feb. 2007 Psychiatric Update (concluding that state of mental health department at the JTDC "place[s] the youth at acute risk of harm to self," and that "the children's mental health needs are

9

still not being met"); Group Ex. B, Apr. 2007 Compliance Rep. (describing youth suicide attempts); Group Ex. B, Report of Compliance Administrator (Jan. 30, 2007) (same).

The chaos at the JTDC is reflected in the constant turnover of its top administrators. In the past year the County has had three different Superintendents. In August 2006, the County terminated Jerry Robinson and replaced him with J.W. Fairman, the very person under whom critical reforms had stalled for years. *See* Ex. I, MIP at 103, n.6. Mr. Fairman recently resigned, after first taking an abrupt leave for nearly two months, and has been replaced on an "acting" basis by Robert Catchings. *See* Ex. M, Cover Letter, Apr. 2007 Compliance Rep. at 2. The County now is searching for yet another Superintendent. Currently, Ms. Moreno-Safarcyk, whose lack of qualifications and political connections are discussed above, and Richard Scott, who also has very limited experience with juvenile detention and has been detailed on a part-time basis from the Cook County Department of Public Health, are the facility's only high level officials assisting the Acting Superintendent.

The County's decision to terminate most of the key managers working diligently on the reform effort while retaining patronage employees who do little work is also illustrated by other flawed personnel practices. Earlier this year, the County eliminated the JTDC's floor managers leaving the staff responsible for the direct care of the young residents largely unsupervised and without assistance. *See* Group Ex. B, Apr. 2007 Compliance Rep. at 6-7. The County also fired the Director of Information Technology who it previously claimed had finally begun to address the absence of the desperately needed management information system at the facility.

The County's failure to address the problem of youth counselors accused of resident abuse also highlight its disregard of this Court's orders. Group Ex. B, Apr. 2007 Compliance Rep. at 4. The County has rehired the youth counselors who were terminated after allegedly

abusing young residents; at least one of them already has been the subject of additional allegations. Several of the nineteen youth counselors accused of resident abuse and mandated by the ASO to participate in intensive training have been the subject of additional allegations of abuse. *See* Group Ex. B, Apr. 2007 Compliance Rep. at 4. The County has broken its promise consistently to provide increased supervision to a particular group of youth counselors repeatedly accused of beating and choking residents. *Id.* Yet the County for years has refused to fill an internal position to investigate allegations of abuse. *Id.* at 20 (noting that the defendants failed to hire an investigator by the MIP's April 15, 2007 deadline).

As a result of the County's short-sighted, politically-motivated actions, the JTDC has devolved into chaos.

2.   <u>The defendants will not bring the JTDC into compliance with the MOA.</u>

Since this case was filed nearly eight years ago, there has been negligible progress improving conditions at the JTDC, and the defendants have made clear they have no real intention of changing. They have violated every one of the key benchmarks in the MIP and effectively ignored the Compliance Administrator's recommendations. *See* Group Ex. B, Apr. 2007 Compliance Rep. at 17; Group Ex. B, Mar. 2007 Compliance Rep. at 13. Consequently, conditions actually have deteriorated in recent months as the County systematically has stripped the JTDC of any remaining capacity to comply, firing individuals with expertise, draining resources to pay for political hires, and failing to implement the MIP's key provisions.

The defendants' flagrant violations of this Court's orders will not be cured by additional extensions of time. For years, the defendants have made no meaningful effort to develop (let alone implement and utilize) an effective management information system, train staff, adopt effective screening instruments, or provide necessary programming at the JTDC. *See supra* Section I. The leadership repeatedly has failed to employ proven behavioral management

11

techniques to encourage youth to conduct themselves appropriately. *See infra* Section III(A). Furthermore, despite the startlingly high incidence of youth at the JTDC with serious mental health issues and numerous suicide attempts, the County resisted for months the approval of the contract to staff the mental health department and has still not arranged for the mandated personnel. *See supra* Section I. All of these efforts are critical to compliance with the MOA, yet the defendants for years have disregarded them all.

The defendants are more than two-thirds of the way through the MIP's six-month implementation period and there is no indication of positive change. As mentioned previously, the accreditation of the JTDC's medical services was revoked. *See* Group Ex. B, Apr. 2007 Compliance Rep. at 1. The Casey Foundation, which had funded several consultants to work with the facility's personnel to improve the JTDC's policies and procedures, has suspended its support citing the futility of the effort. *See* Ex. M, Cover Letter, Apr. 2007 Compliance Rep. at 2. In a recent financial audit of the JTDC, the County itself acknowledged that there are poor financial controls in place at the facility, resulting in unpaid bills, poor bookkeeping, and untracked absenteeism. *See* Group Ex. G, Financial Audit at 1. The County has made one implausible excuse after another to delay real reform. Left to its own devices the County will never comply with its obligations to this Court.[19]

In light of the deteriorating conditions at the JTDC, there is simply no reason to believe that the County or the JTDC are capable of preventing harm to children by bringing the facility

---

[19] Currently, the County appears to be maneuvering to keep executive control of the JTDC while outwardly supporting the legislation to move it under the jurisdiction of the juvenile court. While the County has posted the position of Superintendent for the first time in more than five years, it likely has made the position a multi-year contract, in which case the Board—and not the Chief Judge—would maintain control over the person hired as Superintendent and, ultimately, the JTDC.

into compliance with acceptable standards of care and treatment. There is no option left but to appoint someone who will.

III. **Argument**

A. **Receivership Is the Only Remedy that Will Ensure Compliance with the Court's Orders to Reform the Care and Conditions at the JTDC.**

This Court has ample authority to enforce the MOA and the ASO and grant the relief that the plaintiffs seek. *See People Who Care v. Rockford Bd. of Educ. School Dist. No. 205*, 171 F.3d 1083, 1086-87 (7th Cir. 1999) (recognizing district court's broad deference to implement relief under a remedial decree); *South Suburban Housing Ctr. v. Berry*, 186 F.3d 851, 854 (7th Cir. 1999) (same); *Duran v. Elrod*, 713 F.2d 292, 297 (7th Cir.1983) (same); *see also Thompson v. United States Dep't of Housing & Urban Development*, 404 F.3d 821, 827 (4th Cir. 2005) (citation omitted) (reasoning that broad discretion is especially warranted in institutional reform cases in view of the "nature and purpose" of those decrees). Although a federal court must be mindful of a government authority's interest in managing its own affairs, *see Missouri v. Jenkins*, 495 U.S. 33, 51 (1990) (cautioning that before intruding on local authority, district court must assure itself that no lesser alternatives are adequate to the task), courts have held that "the deference due prison administrators by courts is implicated primarily by questions relating to institutional security" and not by questions related to the poor treatment and conditions of detained youth. *See, e.g.*, *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *25 (N.D. Cal. Oct. 3, 2005) (citing *Benjamin v. Fraser*, 343 F.3d 35, 52 (2d Cir. 2003)). Furthermore, where constitutional rights "have been traduced, principles of restraint, including comity, separation of powers and pragmatic caution dissolve." *Id.* (citation omitted).

Courts properly appoint a receiver when two essential conditions are met: (1) there is threatened or actual harm to the plaintiffs, and (2) other forms of remediation have been

13

exhausted or futile. *See Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D.W. Va. 1990); *Newman v. State of Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979). As described above, the defendants' flagrant noncompliance with this Court's orders has resulted in grave harm to the young residents at the JTDC. *See supra* Sections I and II. It is equally clear that the plaintiffs have exhausted all options other than receivership to redress these harms. In determining whether all of the remedies available in a matter have been tried or proven futile, courts consider several factors.

First, courts consider whether there have been repeated failures to comply with court orders. *Plata*, 2005 WL 2932253, at *23 (citing *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997)). In this case, the defendants have violated this Court's orders to remedy scores of constitutional violations at the JTDC for more than four years. Intensive monitoring, technical assistance, collaboration, mediation,[20] and even the on-site presence of this Court's able Compliance Administrator all have proven futile. This is the plaintiffs' third motion to address the defendants' sweeping noncompliance and enforce the MOA. *See* Ex. N, Motion to Enforce Memorandum of Agreement (filed after defendants failed to issue an implementation plan); Petition to Enforce Memorandum of Agreement (filed after defendants' failure to comply with the MOA resulted in serious threats to the safety, security, and well-being of youth at JTDC), appended hereto as Ex. O. In brazen disregard of this Court's orders and with less than two

---

[20] For example, although the defendants promised numerous times in mediation that they would purchase and install an electronic system to help ensure that staff were conducting 15-minute checks (*i.e.,* performing a visual check of each resident locked in his room every fifteen minutes) as required by the MOA, the defendants now question whether they will employ this system. Specifically, former Superintendent Robinson told the Compliance Administrator that he was authorized to use available grant monies to purchase a Touch Probe to monitor 15-minute checks. Group Ex. C, Report of the Compliance Administrator (Jul. 15, 2006) at 11. However, Superintendent Robinson never made the purchase. In February 2007, then-Superintendent Fairman again promised that the County would purchase an electronic system. *See* Group Ex. B, Feb. 2007 Compliance Rep. at 11. To date, no such system has been purchased. In fact, the defendants now argue that purchasing an electronic system would only delay implementation of the MIP. *See id.*

14

months remaining before the latest deadline for compliance, the defendants have failed to meet even the most preliminary benchmarks set forth in the MIP. *See generally* Group Ex. B, Apr. 2007 Compliance Rep. (cataloguing the defendants' missed deadlines).

Now, in a transparent attempt to avoid responsibility for the defendants' repeated failures to comply with this Court's orders, County Board President Todd Stroger has announced that he embraces legislation, recently passed by the Illinois Legislature, transferring the authority to appoint the Superintendent of the JTDC and other personnel to the Circuit Court of Cook County. *See* Ill. H.B. 0236, 95th Gen. Assembly (2007) (awaiting Governor's signature), available at http://www.ilga.gov/legislation/billstatus.asp?DocNum=236&GAID=9&GA=95&DocTypeID=HB&LegID=26963&SessionID=51 (last visited May 29, 2007), appended hereto as Ex. P. This proposal, which does not go into effect for six months if and when the Governor signs it, provides little comfort to the thousands of youths who for years have been subjected to the violence, filthy conditions and chaos that pervade the JTDC. *Id.* The legislation expressly provides that the County retains authority over key budgeting, purchasing and financial operations. *Id.* Without control of contracting and budgeting, which lie at the root of many of the most significant problems at the JTDC, the Circuit Court will have no more ability to engineer needed reforms than the succession of consultants, court-appointed monitors, and administrators whose recommendations have fallen on deaf ears since this case was filed. *See e.g.,* Group Ex. B, Apr. 2007 Compliance Rep. at 5 (training session delayed due to budgetary concerns,) 11 (decision not to purchase electronic system for 15-minute checks because complying with Cook County purchasing policy would delay implementation), and 12 (failure of Cook County Purchasing Department for months to place order with vendor for necessary

clothing and shoes); Ex. Group B, March 2007 Compliance Rep. at 18 (position of the Assistant Superintendent for Programming was eliminated from the budget).

Of equal significance is the County's present effort to hire a new Superintendent before the law goes into effect. Thus, same entity that has provided years of incompetent leadership is seeking to place yet another person into that role with a contract that may well extend the control of the County Board President beyond its lawful duration.

Second, courts determine whether entering additional orders short of receivership will simply lead to more confrontation and delay. *Plata*, 2005 WL 2932253, at *23 (citing *Dixon*, 967 F. Supp. at 550). If past is prologue, any new pledges the JTDC or the County make should carry no weight. In light of this case's history, what the defendants say they intend to do is utterly unreliable and therefore irrelevant to the question of whether a Receiver is mandated. *See, e.g., Dixon*, 967 F. Supp. at 553; *Gary W. v. State of Louisiana*, No. 74-2412 1990 WL 17537, at *30 (E.D. La. Feb. 26, 1990) ("[T]he responsibility of this Court is clear and compelling: to use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical considerations involved, promises '*realistically to work now*.'" (emphasis in original) (*quoting Green v. County School Bd.*, 391 U.S. 430, 439 (1968)).

Third, courts examine whether there is the leadership necessary to bring about compliance with this Court's orders in a reasonable period of time. *Plata*, 2005 WL 2932253, at *23 (citing *Dixon*, 967 F. Supp. at 550). Cook County has demonstrated repeatedly that it is unwilling to put in place independent administrators at the JTDC who are employed to and capable of complying with this Court's orders. *See supra* Section II(B). As two of the experts

16

retained by the Court Monitors, David Roush and Carl Sanniti concluded in the narrative portion
of the MIP:

> "The information, actions, and findings from a review of the
> organizational administrative structures at and around the CCJTDC
> do not present a compelling argument that the political will [to
> comply with the MIP] exists under the current arrangement. If this
> conclusion remains true, it is unlikely that any implementation plan
> will succeed" (Ex. I, MIP at 107.)

> "The missing piece is leadership." (*Id*. at 126.)

As indicated by the JTDC's managerial, financial, and programmatic bungles, true
leadership has long been absent from the facility. *See, e.g., Gary W*., 1990 WL 17537, at *32
("In instances justifying [receivership], the courts have typically found a lack of leadership that
could be expected to improve conditions within a reasonable period of time, systemic
deficiencies in administrative, organizational, and fiscal structures, institutional inertia, and
similar indicia of bureaucratic morass."). *See Shaw*, 771 F. Supp. at 763 (appointing a receiver
to run prison after defendants failed for years to come into compliance with court order);
*Newman*, 466 F. Supp. at 635 (appointing a receiver to run prison after six years because
defendants lacked the leadership capability to reform a prison, and thus, that a receivership was
necessary).

Finally, to determine whether receivership is warranted, courts may consider evidence of
bad faith. In this matter, the JTDC's and the County's actions or inaction bear the hallmarks of
bad faith. *See Plata*, 2005 WL 2932253, at *23 (citing *Dixon*, 967 F. Supp. at 550). By signing
onto the ASO in lieu of a protracted evidentiary hearing, the defendants agreed to substantially
comply with a new plan for reform. Now, the defendants' baldly refuse to fulfill many of the
MIP's most critical provisions, including the development of specialized mental health units, a
behavior management program, or a roll call. *See* Group Ex. B, Apr. 2007 Compliance Rep. at

6, 14, 27, 43 (no special needs unit, behavior management system, or roll call); Group Ex. B, Mar. 2007 Compliance Rep. at 23, 38, 40 (no special needs unit or roll call); Group Ex. B, Feb. 2007 Compliance Rep. at 19 (no special needs unit). The County's recent public efforts to cede its responsibilities to the JTDC to the juvenile court while continuing to control the facility from behind the scenes demonstrates the true extent of the defendants' recalcitrance.

In circumstances similar to these, federal courts have not hesitated to appoint receivers to operate state or local institutions. *See* Order, *Gautreaux v. Dept. of Housing and Urban Development and Chicago Housing Authority*, 69 C 1459/69 C 1460 (N.D. Ill. Aug. 14, 1987) (Aspen, J.) (appointing a receiver for the Chicago Housing Authority) (appended hereto as Ex. Q); *see also Plata* 2005 WL 2932253, at *33) (appointing a receiver to take control of the delivery of medical services to California state prisoners); *Dixon*, 967 F. Supp. at 551 (appointing a receiver for the District of Columbia Commission on Mental Health Services); *LaShawn A. v. Kelly*, 887 F. Supp. 297 (D.D.C. 1995) (appointing receiver for the District of Columbia Child and Family Services); *Shaw*, 771 F. Supp. at 762 (appointing receiver for county jail); *Gary W.*, 1990 WL 17537, at *17 (appointing receiver for state children's services agencies); *Perez v. Boston Housing Authority*, 400 N.E.2d 1231, 1234 (Mass. 1980) (upholding decision to appoint receiver for city housing authority); *Newman*, 466 F. Supp. at 635-36 (appointing receiver for the Alabama state prison system); *Morgan*, 540 F.2d at 533 (upholding appointment of receiver for racially segregated schools).

Unless this Court appoints a Receiver to bring the JTDC into compliance with this Court's orders, the constitutional violations at the facility will continue unabated.

**B.      The Plaintiffs Have Exhausted the Remedies Available to Them Under the MOA.**

The plaintiffs have more than exhausted the procedures set out in the MOA for addressing the defendants' violations prior to returning to Court. First, although the ASO stayed the plaintiffs' Motion to Enforce the Memorandum of Agreement, the stay expired on January 17, 2007. *See* Ex. L, ASO 17. Accordingly, the plaintiffs now may seek additional relief from the Court for all of the defendants' longstanding violations of the MOA. *Id.*

Second, the plaintiffs have fulfilled all obligations to mediate the defendants' most recent failures to comply with the MOA. *See* Ex. A, MOA ¶ 64(e) (reaffirmed by ASO ¶ 3). On October 4, 2006, the plaintiffs notified the defendants of their failure to comply with the MOA. *See* Letter from Benjamin Wolf to Patrick Blanchard (Oct. 4, 2006), appended hereto as Ex. R. After the defendants failed to respond, the plaintiffs requested that the Monitors mediate the violations and notified the defendants of that request. *See* Letter from Benjamin Wolf to Charles A. Fasano and M. Mahoney (copying counsel for the defendants) (Oct. 20, 2006), appended hereto as Ex. S. Thereafter, the plaintiffs duly mediated numerous violations for six months, meeting on at least eleven separate occasions. Additionally, during mediation, the plaintiffs requested twice that the defendants report their progress regarding dozens of pending benchmarks set forth in the MIP. *See* Letters from Benjamin Wolf to Patrick Blanchard (Feb. 21, 2007 and Apr. 4, 2007), appended hereto as Ex. T and Ex. U, respectively. The defendants refused to respond substantively to the plaintiffs' requests.[21] *See* Letter from Patrick Blanchard to Benjamin Wolf (Apr. 19, 2007), appended hereto as Ex. V. These efforts more than

---

[21] The defendants reasoned that the plaintiffs should address their questions to the Compliance Administrator as opposed to the defendants. Significantly, however, the Compliance Administrator has issued monthly reports (in addition to other reports) addressing the defendants' noncompliance and the defendants have taken no effective steps to respond to those reports either.

adequately fulfill the plaintiffs' obligations under the MOA. Furthermore, because the mediation process failed to remedy the serious risks to the health and safety caused by the defendants' many violations of the MOA, the plaintiffs have no reasonable option but to seek assistance from this Court to mandate compliance. Additional mediation attempts would be pointless.

As Section II of this brief demonstrates, the defendants have failed to make material improvements in the JTDC's conditions after being afforded years to do so. Further mediation will only delay enforcement of the MOA at the expense of the health and well-being of the JTDC's young residents. The only relief that will address the plaintiffs' plight is this Court's enforcement of the MOA through the appointment of a Receiver.

## IV.    Relief Requested

WHEREFORE, the Next Friend, Professor Thomas Geraghty on behalf of the plaintiff class of youth detained at the JTDC, through their counsel, respectfully request that this Court:

(1)    Set this matter for an evidentiary hearing forthwith;

(2)    Appoint a Receiver for the JTDC with full executive and administrative authority to implement the requirements of the MOA and the ASO; and

(3)    Order additional relief as this Court deems appropriate and just.

DATE: May 29, 2007


Respectfully submitted,

*s/ Benjamin S. Wolf*_____
One of the plaintiffs' attorneys

HARVEY GROSSMAN
BENJAMIN S. WOLF
SARAH SCHRIBER
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
312-201-9740

BARRY F. IRWIN
COLBY A. KINGSBURY
COLLEEN SORENSEN
Kirkland & Ellis LLP
200 E. Randolph
Chicago, IL 60601
312-861-2000

21

## CERTIFICATE OF SERVICE

I hereby certify that the forgoing MEMORANDUM IN SUPPORT OF MOTION FOR

THE APPOINTMENT OF RECEIVER was served on the below counsel by the ECF System on

May 29, 2007:

Patrick M. Blanchard
Michael D. Jacobs
Assistant State's Attorneys
Civil Actions Bureau
500 Daley Center
66 West Washington
Chicago, IL 60602


*s/ Benjamin S. Wolf*
ONE OF THE PLAINTIFFS' ATTORNEYS