IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JIMMY DOE, WILLIE ROE, JOHNNY WOE, DANNY ZOE, CHARLIE ROE, and ANDREW LOE, on behalf of themselves and all similarly situated,

Plaintiffs,

v.

COOK COUNTY and SUPERINTENDENT, Cook County Juvenile Temporary Detention Center,

Defendants.

No. 99 C 3945

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Pending before the court is the "Second Report of the Transitional Administrator Pursuant to the Court's May 8, 2008 Order" (Dkt. No. 530 (the "Second Report")), which outlines progress made by the Transitional Administrator ("TA") in his efforts to bring the Cook County Juvenile Temporary Detention Center ("JTDC") into substantial compliance with earlier court orders.

The plaintiff class ("Plaintiffs"), the defendants (collectively referred to as "Cook County"), and the intervenor Teamsters Local Union No. 700[1] (the "Union") generally do not object to the benchmarks and updates set forth in the TA's Second Report. However, the Union

[1] "Intervenor's Agreed Motion for Substitution of Party" (Dkt. No. 584) is granted and Teamsters Local Union No. 700 is hereby substituted for Teamsters Local Union No. 714 for purposes of this litigation.

has objected to the TA's proposal to create new job descriptions for direct care workers at the JTDC and has objected to the TA's proposal to require incumbent direct care workers to "reapply" for these new positions. For the reasons set forth below, the court after full consideration of the matter approves the TA's proposed staffing plan in its entirety.

PROCEDURAL BACKGROUND

This class action lawsuit was initially filed over ten years ago on June 15, 1999. Although the case was dismissed without prejudice in December 2002 pursuant to agreement by the parties, the court retained jurisdiction to enforce the court-approved Memorandum of Agreement ("MOA"), the subsequent Agreed Supplemental Order ("ASO"), and the Modified Implementation Plan ("MIP"). (*See* Dkt. Nos. 71, 136; *see also* Dkt No. 273, Ex. A (text of MOA), Ex. L (text of ASO), and Ex. I (text of MIP).)

On August 16, 2007, the State of Illinois enacted legislation transferring administration of the JTDC from the executive branch of Cook County to the Office of the Chief Judge of the Circuit Court of Cook County ("OCJ"). (*See* Illinois Public Act 95-0194 (effective January 1, 2008).) With the agreement of the parties, the court appointed the TA with the mandate "to bring the [JTDC] into substantial compliance with [the MOA, ASO, and MIP] and, if consistent with Illinois law, to prepare the JTDC for the transition of administrative authority over its operations to the [OCJ]." (Dkt. No. 330 ("Appointment Order") ¶ 1.) Currently, the TA remains engaged in this ongoing assignment, and the transfer of authority to the OCJ has yet to be effected.

In April 2008, the TA sought emergency authorization to retain a private company to provide temporary security staffing at the JTDC. (Dkt. No. 389.) Finding that "the JTDC is

dangerously understaffed and that, as a result of this understaffing, the health and safety of the residents is at risk," the court granted the TA's emergency motion and ordered the TA to report in writing "on the conditions and status of the issues raised in the TA's Emergency Motion" within six months. (Dkt. No. 415 ("May 8, 2008 Order") ¶¶ 3, 6.) Accordingly, the TA filed his First Report in November 2008. (Dkt. No. 458.) The Second Report, now pending before the court, "expands upon the issues discussed in the first report and discusses other progress the [TA] has made toward compliance with all of the Court's Orders." (Second Report at 2.)

## THE SECOND REPORT

Since the time of the TA's First Report, the TA has implemented a plan to reorganize the JTDC around the creation of five new resident living "Centers." (Second Report at 4.) Each Center has approximately 50 beds, with more than 30 dedicated staff members who only perform work in the Center to which they are assigned. (*Id.*) Prior to the implementation of the TA's reorganization plan, the Juvenile Detention Counselors ("JDC") who staffed the old living units at the JTDC were expected to perform "the same work one might expect of an adult jail guard . . . [ensuring that] residents were alive, fed, clothed, in one piece, and brought to court when necessary." (Dkt. No. 557 ("TA's Reply") at 2.) The JDCs who staff the new Centers "are expected to actively engage JTDC residents at all times through implementation of a behavior management program referred to as Cognitive Behavior Training (CBT)." (*Id.* at 3.) "The CBT program involves teaching JTDC residents a system of techniques to monitor thought patterns, recognize the connections between thinking and behavior, and replace distorted thinking with rational thinking in order to foster more appropriate behavior" through group sessions and one-on-one counseling. (*Id.* (citing TA's Ex. C (JTDC Behavior Mgmt. Program Staff Manual) at 6-

7); *see also* TA's Ex. E (Proposed YDS Job Description) ¶¶ 3-7, 11.) JDCs in the new Centers are also expected to respond appropriately to crisis situations, understand and follow JTDC policies concerning the use of force and the use of restraints, engage in active observation of resident behaviors at all times, and competently complete all required written reports. (*Id.* at 8-9 (citing TA's Ex. E ¶¶ 15-22).)

In light of some of the new job requirements expected of direct care workers in the Centers, the TA has adhered to a self-described "unparalleled and aggressive plan to hire and train new permanent employees" at the JTDC. (Second Report at 3.) Accordingly, all newly-hired staff members have completed a structured interview process that includes the use of a "multiple-choice, criterion based" assessment tool known as the "IMPACT" test. (TA's Reply at 4, 10.) The IMPACT test assesses skills and attitudes of direct care workers—testing for both human relations skills and basic literacy levels—and "is widely used and accepted in the juvenile detention field." (*Id.* at 9-11.) The TA has also ensured that all new hires meet a minimum education requirement, holding at least a bachelor's degree.[2] New hires who are in direct and continuous contact with JTDC residents have also received a minimum of 160 hours of training

[2] This requirement complies with the minimum education requirements set forth by the Administrative Office of the Illinois Courts ("AOIC") in its "Policies Governing Hiring, Promotion and Training of Illinois Probation/Court Services Personnel," which require all non-supervisory personnel to hold a bachelor's degree from an accredited college or university. (Dkt. No. 567 ("Pls.' Reply") Ex. B.) The parties dispute whether the AOIC minimum education requirements will apply to incumbent direct care workers at the JTDC when the OCJ assumes administrative responsibility for the JTDC. This court believes that the AOIC has spoken, but that this court need not address the issue at this point in the litigation, as the TA has taken the position that "a bachelor's degree is an appropriate minimum standard for a person in a position involving direct and continuous contact with JTDC residents" *regardless of* whether the AOIC minimum education requirement specifically applies to these employees. (Second Report at 17; *see also* TA's Reply at 6.)

in a newly-created JTDC Training Academy, as well as 80 hours of leadership training in a course prepared for the JTDC by the National Partnership for Juvenile Services and the National Juvenile Detention Association. (Second Report at 3-4.) Approximately 70 incumbent staff members also participated in an intensive full-time training program in preparation for the opening of two new Centers in August 2009. (*Id.* at 5.) It is the TA's goal to ensure that the new JTDC Centers are staffed by "qualified, trained professionals who have skills to work with troubled and behaviorally-challenged children." (TA's Reply at 3.)

As the TA endeavors to transition the remaining living units of the JTDC into four new Centers, the TA has proposed a plan to ensure that the incumbent employees who will staff the JTDC Centers meet the same standards being applied to newly-hired staff members. First, the TA proposes eliminating the positions of JDC and Recreation Worker, and creating the new positions of Youth Development Specialist ("YDS"), Youth Development Specialist Associate ("YDSA"), and Recreation Specialist. (*See* Second Report at 18; TA's Attachments A, B, and C.) The proposed job descriptions for the YDS and YDSA positions mirror the current duties and expectations of the JDCs who now staff the newly-established Centers. (TA's Reply at 4; *see also* TA's Ex. E.) Additionally, these new positions would require completion of the same screening, testing, and interviewing processes currently applied to the JTDC's new hires—with the exception that YDSAs need not hold a bachelor's degree at time of hire, and can instead meet the minimum education requirement by agreeing to complete a bachelor's degree within a certain period of time to be negotiated with the Union. (Second Report at 18.) Under the TA's proposed staffing plan, incumbent staff will also be required to pass the IMPACT test, after which they will be interviewed by "a panel consisting of a bargaining unit representative, a

supervisor, and an independent consultant." (TA's Reply at 5 (citing TA's Attachment B ("Overview of JTDC [Proposed] Hiring Process").) YDSAs would remain at the same salary level until the completion of their degree. (Second Report at 18.) After the new positions are in place, all veteran staff members currently in the position of JDC or Recreation Worker will be invited to apply for a position as a YDS, YDSA, or Recreation Specialist while they continue in their present position at their current rate of pay. (Second Report at 18; TA's Reply at 5.) Finally, the JDC and Recreation Worker positions will be eliminated once the new Centers are fully staffed. (TA's Reply at 4.)

The TA estimates that there are approximately 230 JTDC incumbent employees who would be affected by the TA's proposed staffing plan, and that 180 of these employees "are not degreed and [would] stand to lose their jobs" if the AOIC minimum education requirements were to be enforced without accommodation. (Second Report at 16.)

ANALYSIS

1. Scope of the TA's Mandate

The Union's first objection to the TA's proposed staffing plan is that it exceeds the scope of the TA's mandate. The scope of any consent decree "must be discerned within its four corners." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971)). As set forth above, at the time of his appointment, the TA was given "the authority and responsibility to bring the Cook County Juvenile Temporary Detention Center (JTDC) into substantial compliance with the Memorandum of Agreement (MOA), the Agreed Supplemental Order (ASO), and the Modified Implementation Plan (MIP)." (Appointment Order ¶ 1.) To this end, the court explicitly granted

the TA "[t]he power to establish personnel policies; to create, abolish, or transfer positions; and to hire, terminate, promote, transfer, and evaluate management and staff of the JTDC." (*Id.* ¶ 6(c).) At the time it was written, the Appointment Order recognized that the JTDC would need to be "restructure[d]" to bring it into substantial compliance with earlier court orders. (*Id.* ¶ 5(b).)[3]

The Union acknowledges the MOA requires "that future hiring conform to appropriate standards [and] that incumbent staff receive adequate training." (Dkt. No. 544 ("Union's Resp.") at 2 (citing MOA at 10, ¶ 12).) However, the Union argues that the TA's plan "to force incumbent employees to requalify for employment" goes beyond the scope of "the MOA and its implementing orders." (Dkt. No. 573 ("Union's Final Reply") at 3.) It is the Union's position that "the TA's authority and responsibility are limited . . . to bringing the JTDC into substantial compliance with the MOA, ASO and MIP," and that the Appointment Order did not itself expand the TA's mandate or authority beyond this scope. (*Id.*)

The court respectfully disagrees with the Union's position. Like the MOA, ASO, and MIP, the Appointment Order was consented to by Plaintiffs and Cook County, and was approved by the court. Unlike in *Stotts*, where "there is no mention of layoffs or demotions within the four

---

[3] The MOA specifically requires Cook County to "create and maintain a system which:

a. keeps residents reasonably safe, clean, and adequately housed and fed;
b. provides for the prompt identification of the medical, dental, mental health and developmental needs of youth, and timely access to adequate medical, mental health, and developmental services;
c. provides adequate social and recreational programming;
d. provides due process of law to youth who are being disciplined;
e. houses and disciplines youth in the least restrictive manner appropriate under the circumstances; [and]
f. provides [access to an adequate] education."

(MOA at 8, ¶ 7.)

corners of the decree," *Stotts*, 467 U.S. at 574, the Appointment Order explicitly authorizes the TA "to establish personnel policies; to create, abolish, or transfer positions; and to hire, terminate, promote, transfer, and evaluate management and staff of the JTDC." (Appointment Order ¶ 6(c).) The Appointment Order also explicitly states that it is "supplemental to the MOA, ASO and MIP," (*id.* ¶ 13), and there is nothing in the language of the Appointment Order to suggest that the grant of authority set forth in Paragraph 6 is merely ornamental. The language of the Appointment Order makes clear that Plaintiffs and Cook County intended that the TA should have the power to create new positions at the JTDC, abolish old positions at the JTDC, and "hire, terminate, promote, transfer, and evaluate" JTDC staff in accordance with "personnel policies" established with the aim of creating and maintaining the system described in the original MOA. The TA's proposed staffing plan is consistent with this grant of authority.

To the extent the Appointment Order also explicitly requires the TA to exercise his authority "in a manner consistent with the laws, policies and regulations of Cook County and the laws of the State of Illinois," unless this requirement is waived by the court (*id.* ¶ 5(f)), the court addresses the Union's concerns below.

2. <u>The Union's Collective Bargaining Rights</u>

The Union next argues that "Illinois law mandates that an employer bargain over new employment standards that require incumbent employees to reapply or requalify for employment." (Union's Resp. at 5.) This argument is driven by the Union's concern that the TA's proposed staffing plan will result in a "wholesale replacement of incumbent staff," insofar as the TA intends to "fir[e] employees whose work is admittedly satisfactory but who the TA's staff would not choose to rehire today." (*Id.* at 4.)

Pursuant to the Illinois Public Labor Relations Act ("IPLRA"), a public employer like the JTDC has a duty to engage in collective bargaining "over any matter with respect to wages, hours and other conditions of employment, not specifically provided for in any other law or not specifically in violations of the provisions of any law." 5 ILCS 315/7 ("Section 7"). An employer that "refuse[s] to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit" has engaged in an "unfair labor practice." 5 ILCS 315/10(a)(4). On the other hand, "[e]mployers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees." 5 ILCS 315/4 ("Section 4").

Illinois courts have recognized that certain matters of inherent managerial policy can also impact wages, hours and terms and conditions of employment. *See AFSCME, AFL-CIO v. State Labor Relations Bd.*, 546 N.E.2d 687, 691 (Ill. App. Ct. 1st Dist. 1989) ("Clearly tension exists between the two provisions; any managerial policy will have some impact on conditions of employment.") In such "hybrid" situations, "the determination of whether the employer must collectively bargain can only be resolved by weighing the benefits of bargaining with the burdens on management." *Forest Pres. Dist. of Cook County v. Ill. Labor Relations Bd.*, 861 N.E.2d 231, 247-48 (Ill. App. Ct. 1st Dist. 2006) (citing *Central City Educ. Ass'n v. Ill. Educ. Labor Relations Bd.*, 599 N.E.2d 892 (Ill. 1992)). Ultimately, the matter will be considered a mandatory subject of bargaining only if "the benefits of bargaining outweigh the burdens bargaining imposes on the employer's authority." *Id.* at 248.

In applying the requisite balancing test, courts must analyze the specific facts of each case, including: the employer's statutory mission; the nature of the public service provided by the employer; the particular reasons for and governmental policies underlying the matter at issue; the practicalities of bargaining under the particular circumstances; whether the employer has a special need for speed, flexibility or secrecy in making certain policy decisions; and whether the issues are amenable to resolution through the negotiations process. *Village of Franklin Park*, 8 PERI (LRP) P2039 LEXIS (Ill. State Labor Relations Bd. 1992), *aff'd*, 638 N.E.2d 1144 (Ill. App. Ct. 1st Dist. 1994) (citations omitted).

The Union asserts that "under the Illinois Labor Relations Board's balancing test, requalification schemes are mandatory subjects of bargaining because of their profound effect on employment." (Union's Final Reply at 8.)[4] The problem with the Union's argument is that it ignores the fact-specific nature of the court's inquiry. Each of the relevant cases cited by the Union in support of its argument explicitly identifies the need for a "case-by-case analysis" when Section 4 and Section 7 are in tension, thereby avoiding any sweeping conclusions regarding the need for mandatory bargaining. *See County of Cook (Cermak Health Services)*, 3 PERI (LRP) P3030 LEXIS (Ill. Local Labor Relations Bd. 1987); *Village of Franklin Park*, 8 PERI (LRP)

[4] The Union concedes that "some elements of the TA's plan, such as the training curriculum, revised duties that include the use of enhanced techniques for handling residents, and staff evaluation, are inherent functions of management." (Union's Final Reply at 10.) Additionally, because the TA takes the position that "collective bargaining would be appropriate with respect to issues such as the length of time YDSA's have to obtain degrees and what assistance is available to help them do so" (TA's Reply at 7), the court need not address the question of whether the TA is required to negotiate over these issues.

P2039.[5] Although the Union does not dispute that the decision to require "requalification" for the new positions (and the selection of applicable standards for requalification) directly impacts the managerial policies outlined in Section 4, including "the functions of the [JTDC], standards of services, . . . the organizational structure and selection of new employees [to staff the Centers], examination techniques and direction of employees," the Union fails to address in practical terms the anticipated benefits of bargaining over the new standards and requirements. The only expected benefit identified by the Union is the general opportunity to address matters that "profoundly affect employment rights." (Union's Final Reply at 9-10.) This argument does nothing to suggest that issues such as the proposed minimum education requirement and application of the IMPACT test are amenable to resolution through the negotiation process.

On the other hand, the TA has taken the position that "there is virtually no benefit to bargaining over implementation of the YDS job classification." (TA's Reply at 13.) Rather, the TA opines that "the only thing to be gained by bargaining is more delay." (*Id.*) Recognizing the price of delay, Plaintiffs likewise stress the need to address the remaining defects in the overall structure of the JTDC system in a prompt manner. (Dkt. No. 559 ("Pls.' Reply") at 16.)[6]

The Union correctly points out that there has been no judicial finding that "purging the JTDC of [incumbent direct care employees] is necessary to correct [Plaintiffs' alleged constitutional violations]" (Union's Resp. at 8), nor has there been a specific finding that JTDC

---

[5] The Union also cites *AFSCME Council 31, AFL-CIO v. County of Cook*, 584 N.E.2d 116 (Ill. 1991), but this case does not address the tension between Section 4 and Section 7, nor does it apply the balancing test.

[6] Cook County defers to the court on all matters raised in the Union's Response. (Dkt. No. 555 ¶ 7.)

residents *currently* face an "ongoing danger to health and safety [due to] unqualified staff stay[ing] in their current positions" (Pls.' Reply at 16). However, it is undisputed that approximately half of the JTDC's current residents are housed in units structured on the old JTDC "system" (TA's Reply at 4)—a system that was to be "restructured" by court order. The TA has gone through great efforts to explain the particular reasons for and policies underlying his decision to implement specific employment standards for the new job positions, and how these standards relate to his court-mandated mission to restructure the JTDC. (*See generally* TA's Reply at 4-9.) The court also takes judicial notice of the various difficulties encountered over the last seven and one-half years of attempting to bring the JTDC into substantial compliance with the MOA and other court orders. At this point in the litigation, the court finds that the TA's need for speed and flexibility is at a premium.

In light of these considerations, the court finds that the benefits of bargaining do not outweigh the burdens that bargaining would impose on the TA's managerial authority, and concludes that the TA, under the fact specific circumstances of this case, does not have a duty under the IPLRA to engage in mandatory bargaining regarding imposition of the proposed requalification standards.

3. Substantive and Procedural Due Process Violations

The Union also argues that the TA's proposed staffing plan "violates the substantive and procedural due process rights that JDCs enjoy by virtue of their contractual job protections and state or local law." (Union's Resp. at 13.) Assuming, without deciding, that Union employees have a protectable property interest in their employment at the JTDC, the court finds that the Union's arguments in support of this position nevertheless fail.

The court agrees with the reasonableness of the Union's speculation that some terminations "will invariably follow" implementation of the TA's proposed staffing plan. (*Id.* at 14.) The Union argues that these anticipated terminations will necessarily violate its members' procedural due process rights because they will have been made without cause. However, the Seventh Circuit has made clear that "due process is not implicated when government employees are laid off due to a reorganization," as long as the reorganization itself is legitimate and not a sham. *Gunville v. Walker*, 583 F.3d 979, 989 (7th Cir. 2009) (citing *Misek v. City of Chicago*, 783 F.2d 98, 100 (7th Cir. 1986)). On the record now before it, this court has no reason to believe that the TA's proposed staffing plan is a pretext contrived to rid the JTDC of qualified incumbent JDCs for an illegitimate reason. Rather, the court finds that the TA's proposed staffing plan is a legitimate means of exercising the TA's authority "to establish personnel policies; to create, abolish, or transfer positions; and to hire, terminate, promote, transfer, and evaluate management and staff of the JTDC" (Appointment Order ¶ 6(c)) for the approved purpose of restructuring the JTDC's overall system. In contrast to the position taken by the Union, it appears to the court that the TA has made special efforts to ensure that incumbent JDCs will have a full and fair opportunity to be able to remain employed by the newly-restructured JTDC, rather than recommending a wholesale layoff or termination of veteran staff. To the extent the TA's proposed staffing plan is likely to lead to a reorganization of JTDC staff and the termination of *unqualified* incumbent direct care workers, the court finds the reorganization to be legitimate.[7] Of course, the court only addresses the Union's argument to the extent necessary to

[7] The Union has elsewhere argued that the IMPACT test is an unreliable predictor of job performance, because its validity varies with the test-takers' years of experience. (Union's Final Reply at 11.) The court finds that the risk of terminating qualified JDCs through use of the

approve implementation of the TA's proposed staffing plan as it has been presented to the court. The Union is free to argue at any point in the future that, in practice, the TA's staffing plan differed from the plan presented to the court or otherwise impacted individual rights in unforeseen ways. At this point in the litigation, however, the court finds that no procedural due process concerns are implicated by the TA's proposed staffing plan.

The Union also argues that the TA's proposed staffing plan violates its members' substantive due process rights insofar as the plan is so arbitrary that it "shocks the conscience." (Union's Resp. at 14.) Again, the court disagrees.

Substantive due process "protects an individual from the exercise of governmental power without a reasonable justification." *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007). As a general matter, a violation of substantive due process rights occurs when executive action has been undertaken "without any reasonable justification in the service of a legitimate governmental objective," such that the government's exercise of power can be said to "shock[ ] the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). When, as in this case, "the circumstances permit public officials the opportunity for reasoned deliberation in their decisions . . . the official's conduct [is considered] conscience shocking when it evinces a deliberate indifference to the rights of the individual." *King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007). To succeed on a substantive due process theory, a plaintiff must

---

IMPACT test is acceptable, in light of the fact that the test remains "highly predictive" for test takers with more than five years' experience and the test is widely used in the juvenile detention field. (TA's Reply at 10-11, n. 5.) The court rejects the Union's proposed alternative—training incumbent JDCs in the new procedures and duties and subjecting any direct care workers who fail to meet the new standards to discipline or discharge for cause—as unreasonably burdensome in terms of duration, expense, and risk to the new system being developed at the JTDC for purposes of bringing it into substantial compliance with the MOA, ASO, and MIP.

first establish the violation of a fundamental right or liberty interest. *Belcher*, 497 F.3d at 754; *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("we have required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest") (citations omitted).

In this case, the Union does not explicitly articulate any fundamental liberty interest implicated by the TA's proposed staffing plan, or any specific fundamental rights to which the Union asserts the TA is being deliberately indifferent. The Union's citation to *King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 818-19 (7th Cir. 2007), suggests that the Union relies on an anticipated violation of "the right to protection against state-created dangers." However, the state-created danger doctrine generally applies to scenarios involving physical danger, as in cases of death, bodily injury, or serious medical need, and the court is hesitant to expand the doctrine to the circumstances of this case. Additionally, and perhaps more important, the court finds that there is nothing in the TA's proposed staffing plan to suggest that it is "arbitrary in the constitutional sense." *Lewis*, 523 U.S. at 846. The TA has thoroughly explained why and how he is proposing changes to the JTDC staffing structure. The TA has remained respectful to and cognizant of the fact that "[t]he transition taking place at the JTDC raises real questions of fairness to these [incumbent] employees, for whom the rules have essentially changed mid-way through their careers." (Second Report at 18.) On the record now before it, the court has no reason to believe that the TA's proposed staffing plan will bring about any substantive due process violations when put into effect.

4. Requirements of the Prison Litigation Reform Act

Finally, the Union argues that the TA's proposed staffing plan does not comport with the Prison Litigation Reform Act ("PLRA"), which states that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. 3626(a)(1)(A). It is the Union's position that none of the factual findings made by the court thus far in this case suggest "that abrogating the legal and contractual protections of *all* veteran employees, the vast majority of whom have never been charged with abuse, is 'necessary to correct the violation of the Federal right,' let alone the least disruptive means of doing so." (Union's Resp. at 12-13 (emphasis in original).)

The first problem with this argument is that, as explained above, the court has found the TA's proposed staffing plan does not abrogate any valid legal protections asserted by the Union, insofar as the TA's proposed staffing plan is consistent with the TA's grant of authority, does not violate the Union's collective bargaining rights, and does not implicate any due process concerns. Additionally, the Union's argument misses the mark, because court approval of the TA's proposed staffing plan at this point in the litigation does not itself constitute an order for prospective relief. In other words, the court is not *ordering* the TA to do anything. Any court approval of the TA's proposed staffing plan is analogous to a declaratory judgment regarding the scope of the TA's authority as previously set forth in earlier court orders, and actions interpreting previously-entered consent decrees are not considered "fresh" injunctions if they do not "substantially and obviously alter[ ] the parties' pre-existing legal relationship." *Jones-El v. Berge*, 374 F.3d 541, 544 (7th Cir. 2004). At the time of the TA's appointment, the court specifically found that the prospective relief set forth in the Appointment Order—including

the grant of broad managerial powers to the TA[8]—complied with the PLRA's requirements for settlement of class actions. (Appointment Order ¶ 3.) Although the Union hints that the consent decrees memorialized in the MOA, ASO, MIP, and Appointment Order may no longer be necessary to correct any underlying constitutional violations (*see* Union's Resp. at 12; Union's Final Reply at 7 n.4), the Union does not go so far as to request an evidentiary hearing on this question, nor does the Union actually ask the court to terminate these orders pursuant to 18 U.S.C. § 3626(b). In light of the fact that the TA remains vested with the broad managerial powers initially conferred upon him by this court, and the fact that this court has found the TA's proposed staffing plan to be consistent with these powers, the court's interpretation of the Appointment Order consent decree cannot be said to substantially alter the parties' pre-existing relationship.

Finally, to the extent the court's approval of the TA's proposed staffing plan can be considered an enforcement order, the court notes that the Seventh Circuit has concluded "[t]he enforcement of a valid consent decree is not the kind of 'prospective relief' considered by § 3626(a)." *Jones-El*, 374 F.3d at 545.

---

[8] The TA was given the responsibility to "oversee, supervise, and direct all management, administrative, financial, contractual, personnel, security, housing, custodial, purchasing, maintenance, technology, health services, mental health services, food and laundry service, recreational, educational, and programmatic functions relating to the operation of the JTDC consistent with the authority vested in the position of Superintendent of the JTDC and to restructure the JTDC into an institution that substantially complies with the MOA, the ASO, and the MIP." (Appointment Order at 5(b).)

CONCLUSION

For the reasons set forth above, the court approves of the Transitional Administrator's proposed staffing plan for the Cook County Juvenile Temporary Detention Center as set forth in the "Second Report of the Transitional Administrator Pursuant to the Court's May 8, 2008 Order." (Dkt. No. 530.) Status hearing set for July 20, 2010, for purposes of setting further dates as appropriate.

ENTER:

James F. Holderman
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: June 23, 2010