IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JIMMY DOE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 99 C 3945 |
| | ) | |
| v. | ) | |
| | ) | |
| COOK COUNTY, *et al.*, | ) | Hon. James F. Holderman |
| | ) | |
| Defendants. | ) | |

**SPECIAL STATUS REPORT OF THE TRANSITIONAL**
**ADMINISTRATOR ON OVERCROWDING AT THE JTDC**

Earl Dunlap, Transitional Administrator of the Cook County Juvenile Temporary Detention Center (JTDC), hereby submits this special status report.

**Introduction**

This special report of the TA focuses on overpopulation at the JTDC.[1] The TA has flagged this issue in prior reports to the Court, but feels compelled to formally notify the Court, the *Doe* parties, and the Office of the Chief Judge of the Circuit Court of Cook County (OCJ) that the overpopulation problem at the JTDC has reached crisis levels.

Consistent with the *Doe* parties' Modified Implementation Plan (MIP), the TA has been alerting various JTDC stakeholders to the problems over the past several months. See MIP, Paragraph 39 (requiring the JTDC Superintendent to notify stakeholders when the population exceeds 90% of the rated capacity for more than 10 days). The TA has alerted to the *Doe* parties, OCJ, and the Juvenile Court of Cook County of the growing population, and has provided

---

[1] On August 14, 2007, the Court entered an Order Appointing a Transitional Administrator to operate the JTDC. *See* Doc. No. 330. The Order directs the TA to report to the Court on a regular basis. *See* Doc. Nos. 458, 530, 646, 680, 686, 711 (TA's prior reports).

express notice when the population reached 90% of the functional operating capacity, and again when the facility reached 100% of the functional operating capacity. *See e.g.*, Exhibit A (correspondence dated 9/26/13, 10/10/13, 3/24/14, 4/24/14, 7/29/14, 9/2/14, 9/29/14, 9/30/14, 10/2/14, 11/3/14). The TA has also been attempting to engage OCJ on creating a plan to address the rising population as it relates to transition. *See e.g.*, Exhibit B (7/16/14, 9/5/14, 9/16/14).

Unfortunately, OCJ has chosen not to engage with the TA about this important subject at all. Around August 2014, the Presiding Judge of the Juvenile Court of Cook County convened a group of stakeholders to look at possible ways to address the overpopulation problem, albeit reluctantly. At these stakeholder meetings, the Presiding Juvenile Court Judge has exhibited a disappointing lack of support for the JTDC reform efforts, for example, by stating his belief that the rated capacity at the JTDC is "whatever the population is on any given day" and that the overcrowding problem was a problem of the TA's making as it relates to the TA's Center within a Center concept. Notwithstanding these meetings convened by the Presiding Judge of the Juvenile Court, no solutions to address the population crisis have been implemented, and the JTDC population continues to grow.

The purpose of this report is to articulate scope and consequences of the overcrowding crisis, so that the *Doe* parties and all JTDC stakeholders are fully apprised of the gravity of this problem and its impact on the *Doe* litigation. Overpopulation at the JTDC is already threatening to reverse the past seven years' of the TA's work and return unconstitutionally unsafe living conditions to the JTDC.

Although the TA has been able to accomplish much at the JTDC, he does not control the number of youth who are ordered to secure detention at the JTDC. The TA sincerely hopes that the *Doe* parties, OCJ, and JTDC stakeholders will take this information seriously and act

expeditiously to get the JTDC population back to safe levels. There are a wide range of possible options, from revamping the manner in which the Juvenile Probation Department "screens" residents into secure detention to building a new facility to hold youth who cannot be accommodated in the current building. For the purpose of this report, the TA takes no position on what ought to be done, and instead seeks only to make the urgent point that something must be done. If the problem continues unabated, unconstitutional conditions will return to the JTDC and transition will not be able to occur. The TA will only have one remaining option for maintaining the safety and security at the facility: he will have to ask the Court to intervene and set a court-ordered limit the number of residents that may be housed at the JTDC.

## Discussion

### I. The JTDC Population Is Over Capacity

As the TA explained in his prior report to this Court, the functional operating capacity of the JTDC is 382 residents. *See* Doc. 711 at 8-9 (explaining how the TA arrived at the number of 382). This is the maximum number of residents that can be reliably housed at the JTDC in a safe and secure manner.

As the chart below shows, the average monthly population at the JTDC has been steadily increasing over the past six months, and it has recently surpassed the functional operating capacity of 382 residents. On November 12, 2014, the population reached an all-time peak since the TA's appointment of 418 residents, which is 109% of the functional operating capacity.

Table 1: Juvenile Temporary Detention Center
Average Monthly Population
July 2013 to November 15, 2014



The increase in JTDC population is largely attributable to the "Raise the Age" legislation, 705 ILCS 405/5-410, that went into effect in January 2014. This legislation increased the age for juvenile court jurisdiction from 17 to 18. With this legislation in effect, JTDC now detains residents with adult criminal court cases until their 18th birthday rather than their 17th birthday, 365 days longer than previously required. Additionally, any 17-year-olds with adult criminal court cases are now detained at JTDC rather than at the Cook County Jail. The chart below illustrates the relative increase in time between juveniles and ATs (residents with adult court criminal cases) at the JTDC from July 2013 (before Raise the Age) to November 2014.

Table 2: Juvenile Temporary Detention Center
Average Monthly Population
ATs vs. Juveniles
July 2013 to November 15, 2014



In the 16-month period from June 2013 to October 2014, the average daily population for automatic transfers (AT's), increased by 81%. Over that same period of time, the average daily population for juvenile detainees increased by 23%. The average daily population overall increased by 39% (midnight count) and by 37% (walking count). Because these increases are linked to a change in state law, there is no reason to think that the current population increase is

5

going to reverse itself anytime soon. In other words, overpopulation at the JTDC is a problem that requires thought-out solution; it will not solve itself.[2]

## II. Consequences of Overcrowding at the JTDC

To be sure, JTDC residents *are* suffering as a result of overcrowding. In the 16-month period between June 2013 and October 2014 there has been a statistically significant increase in the use of 1-hour room confinement, fights, and injuries at the JTDC.[3] Also, as the population has increased, the numbers of JTDC residents who have been subject to room confinement and have been involved in acts of violence, including those leading to physical injuries has also increased. *See* Exhibit C (Correlation Coefficients). These data are very troubling.

As with the existence of violence at the JTDC, room confinement is another occurrence that potentially threatens the well-being of JTDC residents. Studies show that isolation through room confinement can have adverse impact on young people, including aggravation of mental illnesses and feelings of re-traumatization because events preceding room confinement often involve use of force. Indeed, the overuse of room confinement was one of the problems at the JTDC that led to the appointment of the TA; the MIP limits the use of room confinement to 36 hours. The TA uses room confinement only when necessary isolate youth who behave dangerously, which as stated above, occurs with increasing frequency as the population grows.

---

[2] To be sure, some aspects of the overcrowding issue are not attributable to Raise the Age, at least not entirely. For example, the average length of stay at the JTDC is 7 days or less for 29% of the youth who have been admitted to the facility in 2014. Likewise, the JTDC population tends to spike around weekends and holidays, periods of court inactivity. These figures strongly suggest that there are young people sent to the JTDC that do not truly need to be there. Efforts must be made to address these problems as well.

[3] The statistical significance is from a comparison of monthly averages from pre-Raise the Age versus post-Raise the Age.

The data also indicate that as the JTDC population has gone up, the number of staff members required to conduct a physical restraint on JTDC residents has also gone up. This means that disturbances that used to take one staff member to control now require more than one staff member to control, implying that disturbances require an increased number of staff to avoid bad outcomes. Not surprisingly, there has also been an increased in incidents resulting in assaults on JTDC staff. During the first three weeks of November 2014, there have been 23 incidents of staff assaults. For that same period in 2013, there were 7 incidents of staff assaults. Not only has the increase in population at the JTDC made the facility less safe for residents, but data also suggest it is less safe for staff.

These JTDC-specific data are consistent with social science research, which show that when population of a juvenile detention or corrections facility exceeds its functional operating capacity, there are increases in: rates of juvenile-on-staff injury, rates of juvenile-on-juvenile injury, rates of suicidal behavior, and increases in use of room confinement. *See* Office of Juvenile Justice & Juvenile Delinquency Programs, U.S. Dep't of Justice, *Conditions of Confinement: Juvenile Detention and Corrections Facilities* (Parent et al., 1994). Other studies show that overcrowding leads to increases in disruptive and aggressive behaviors and decreases in residents' perception of order, organization, and staff support. D.W. Ray et al., *The Effects of Population Density Upon Juvenile Inmate Perceptions*, 6 Journal of Humanics 122-129 (1978).

There can be no legitimate question that the current state of overcrowding at the JTDC is subjecting JTDC residents and staff to more dangerous and harmful conditions.

### III. The Future: How Bad Will It Get?

One of the reasons that the JTDC maintained some semblance of order and safety notwithstanding the current state of overcrowding is that the facility has been able to continue to house residents in single rooms. Research shows that the effects of crowding are mitigated in facilities that maintain single-room housing for residents. *See* Parent et al., *supra*. If the population continues to increase, or if a living unit becomes inoperable for physical plant issues (not an uncommon occurrence), then the JTDC will no longer be able to maintain single-room housing for residents, and the facility will become exponentially less safe.

One way to preserve single-room housing is to shuffle residents among Centers, but that approach would compromise the JTDC classification system, which organizes residents based on age, gender, mental health issues, behavior issues, gang affiliation, and other categories. As the Court is aware, implementation of the "Center within a Center" concept is a central feature of the TA's reform effort, which has enabled the TA to bring constitutional living conditions to the JTDC. *See* Docs. 530, 557 (describing the TA's staffing plan and its relation to the "Center within a Center" concept), 589 (June 23, 2010 memorandum opinion and order allowing the TA to proceed with the staffing plan). Jeopardizing the JTDC classification system in this way obviously poses its own safety risks.

The alternative is for JTDC residents to sleep on cots in common areas of the Centers to which they are assigned. Although this approach maintains the classification system, it poses other safety risks because there is insufficient staffing on each living unit to accommodate such a sleeping arrangement, particularly at night when staffing levels are reduced while remaining in compliance with state and federal regulation. The Office of the TA has made arrangements with Wackenhut to have emergency extra staffing on hand in the event continued overcrowding forces

the facility to go this route. Wackenhut is the firm that the TA previously used when the Court granted authority for the TA to use a private contractor to address staffing shortages, *see* Doc. 415 (Court's May 8, 2008 order).

Fortunately, the upcoming holiday season might offer some reprieve from the over-population problem in the short term. Historically, the JTDC population drops around the holidays, only to rise again early in the new year. *See e.g.*, Table 1, *supra*. The TA is not aware of any explanation for this trend other than that the holidays have an impact on the way judges, probation personnel, police, and prosecutors make decisions about whether youth should be in detention.[4] In the TA's view, this trend is a strong indicator that the current practices associated with decisions to detain are unsound. Either youth pose a risk to public safety or they do not; holidays should not be consideration.

Although a decline in the JTDC population in the coming holiday season would certainly be a welcome development, it is important to note that such a decline does not mean that the over-population problem is solved. If anything, it is only an indication that the system for determining which residents belong in detention needs to be reassessed. Absent some sort of serious intervention to stem the JTDC population, the numbers will almost certainly increase beyond capacity in early 2015.

---

[4] This trend was initially observed by James M. Jordan, a pioneer in the field of juvenile detention who was superintendent of the JTDC in the 1950s: "Our studies have found that the Christmas spirit pervades the police, the judges, and all of the court personnel, and I feel that if they can lower admissions at Christmas time then we should have Christmas every day of the year." *See* A National Institute for Juvenile Detention Home Administrators: Final Report. Delinquency Study and Youth Development Project, Southern Illinois University-Edwardsville. 41 (Holmes, J.A. Ed. 1968).

**Conclusion**

The TA cannot overstate the seriousness of the current overpopulation problem. The TA strongly urges those with the power to get the JTDC population problem under control and/or develop strategies for alternative sites to accommodate the increasing population take action to do so. If current trends continue unabated, the gains made at the JTDC during the course of this litigation will unravel, unconstitutional conditions will return, further litigation will be needed to resolve this matter, and transition will not be able to occur anytime soon.

RESPECTFULLY SUBMITTED,

 /s/ Jon Loevy
*Attorney for the*
*Transitional Administrator*

Arthur Loevy
Jon Loevy
Elizabeth Mazur
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, Illinois 60607
(312) 243-5900

## **CERTIFICATE OF SERVICE**

      I, Jon Loevy, an attorney, certify that on November 26, 2014, I served this document on counsel of record via the CM/ECF system.

      /s/ Jon Loevy
      *Attorney for the*
      *Transitional Administrator*

Arthur Loevy
Jon Loevy
Elizabeth Mazur
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, Illinois 60607
(312) 243-5900