IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JIMMY DOE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 99 C 3945 |
| | ) |
| v. | ) |
| | ) |
| COOK COUNTY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

### FINAL STATUS REPORT OF EARL DUNALP REGARDING THE COOK COUNTY JUVENILE TEMPORARY DETENTION CENTER

Now comes Earl Dunlap, in his capacity as Court Appointed Expert for the Cook County Juvenile Temporary Detention Center (JTDC), pursuant to this Court's May 15, 2015 Concluding Order, Doc. 786, and submits this status report.

### Introduction

On May 15, 2015, this Court entered an order (called a "Concluding Order") that was agreed to by all parties to the *Doe* litigation, as well as the Office of the Chief Judge of the Circuit Court of Cook County ("OCJ"). Doc. 786 (Concluding Order). The Concluding Order transferred administrative control of the JTDC from Earl Dunlap, the court-appointed Transitional Administrator of the JTDC, to OCJ. *Id.* The Concluding Order also set forth parameters for a three-month observation period to follow the transfer of control to OCJ, during which Mr. Dunlap would act as a Court Appointed Expert and report back to the *Doe* parties and the Court about the status of transition at the JTDC. *Id.*

Between May and August 2015, Mr. Dunlap worked in cooperation with OCJ's newly-appointed Superintendent Leonard Dixon to collect information and identify any potentially serious deviations from the MOA or MIP. *See id.* at ¶ 10. At the conclusion of the three-month observation period, on August 20, 2015, Mr. Dunlap convened a meeting of the *Doe* parties, OCJ, and Mr. Dixon to discuss his findings and long-term recommendations. Those findings and recommendations are summarized in this report.

**Transition Benchmarks**

In the weeks and months leading up to the May 2015 transition, the *Doe* parties focused their attention on attaining certain benchmarks that the TA believed were crucial to an orderly and seamless transition. *See* Doc. 772-1 (the transition benchmark list). By May 15, 2015, many of those tasks were complete or close to complete, but loose ends remained. At the end of the observation period, it appears that substantial progress has been made in each area.

To be more specific, the contracts that the TA had entered into with key vendors and consultants have been fully transferred to the County, and those vendors and consultants continue to operate at the JTDC. A "petty cash" account has been created at the JTDC that will allow Superintendent Dixon and those who come after him to make emergency purchases when necessary. The hiring and disciplinary systems that the TA implemented have been maintained, and collective bargaining negotiations have begun. Finally, the key technology projects that were initiated by the TA but could not reasonably be completed prior to formal transition

2

(the Resident Management Information System (RMIS) and the Electronic Medical Records projects) are well on their way toward implementation.

One item on the transition benchmark list that warrants particular attention here is controlling the JTDC population. At the end of the three-month observation period, the JTDC population was comfortably below the agreed-upon functional operating capacity of 382. Mr. Dixon has undertaken efforts to continue to keep the population at a manageable number. He has met with Juvenile Court judges to help them understand the need to keep residents out of the facility, worked on developing a "release valve" policy that will provide judges an avenue to release residents, and is involved in efforts to modify the intake screening tool that Juvenile Court judges use to decide if residents should be sent to detention. Mr. Dunlap acknowledges these efforts are positive steps, but feels that ongoing compliance with the MOA and MIP will require additional effort on the part of all County juvenile justice stakeholders. It is insufficient to leave this matter solely at the doorstep of the new Superintendent. In particular, the Presiding Judge of the Juvenile Court must make a proactive effort to assemble and engage stakeholders. Furthermore, although the Juvenile Probation Department has hired new employees to work as "detention expeditors," data shows these "expeditors" have had virtually no effect on reducing the population at the JTDC. At a minimum, serious consideration should be given to placing the management of the "expeditors" under the JTDC Superintendent instead of the Probation Department.

**Increased Room Confinement**

One issue that Mr. Dunlap highlighted at the August 20, 2015 *Doe* parties' meeting is that the use of room confinement has increased in some areas during the observation period. The overuse of room confinement at the JTDC was an important issue leading up to the Transitional Administrator's appointment in 2007, and Plaintiffs have appropriately maintained a strong level of concern about the issue throughout the litigation.

On this issue, however, Mr. Dunlap notes that increased use of room confinement is not necessarily bad. Not all room confinement necessarily needs to be viewed as "punishment." To the contrary, accountability and consequences are appropriate in light of the sophisticated due process system that was implemented during the TA's tenure and is still in place. And indeed it appears that the increased use of room confinement has been appropriate, as there have been a number of violent assaults at the JTDC in the past few months.[1]

The most important aspect of using room confinement is that safeguards are in place to ensure that room confinement is not abused. Fortunately, the JTDC has safeguards in place, and more are forthcoming. Specifically, policy promulgated by the TA and continued under Superintendent Dixon requires that every resident,

---

[1] Mr. Dunlap feels strongly that the increase in these incidents is in no way a reflection on the performance of Superintendent Dixon or his staff in the past months. In a youth detention facility, incidents such as these are bound to occur. The proper measure of detention staff's effectiveness is not the number of these incidents that occur, but rather how staff responds to these incidents. On the latter issue, Superintendent Dixon's staff has done very well.

4

pursuant to a rule violation, receive a due process hearing within four hours of a room confinement. This policy is unprecedented in any juvenile detention facility. In addition, residents are provided with a comprehensive multidisciplinary re-entry plan and community service within the JTDC as a means of restoration following room confinement occurrences.

Furthermore, when the new RMIS system is in place, JTDC administrators and stakeholders will have access to data that will allow them to analyze room confinement occurrences and determine whether they are being used inappropriately. The importance of these tools cannot be overstated. The primary reason why overuse of room confinement was such a problem at the JTDC in the past is that no data was collected or shared; the problem was hidden and abuses continued unabated. As long as the JTDC continues to collect and analyze this data and make it available to stakeholders and advocates, then the potential overuse of room confinement can be monitored carefully.

**Long Term Recommendations**

Finally, Mr. Dunlap would like to leave the *Doe* parties and OCJ with some long term recommendations based on his experience at the JTDC over the past eight years and his expertise in the juvenile justice field.

***Physical plant.*** Although Mr. Dunlap and the County spent considerable effort during the *Doe* litigation improving safety and security at the JTDC (for example, by installing cameras, replacing ceiling tiles, replacing doors, etc.), Mr. Dunlap has long commented that the current JTDC physical plant is inadequate.

The JTDC is old, antiquated, and operationally inefficient. The physical layout of the five-decade-old building makes the direct and continuous supervision of high-risk residents virtually impossible, jeopardizing safety and enhancing potential liability to the County. In addition, the inefficiencies of the physical plant necessitate a staffing allocation far in excess of that of a more modern facility. Meanwhile, residents and staff are subjected to chronic physical plant environmental problems that the County is forced to "shovel" additional funds into simply to sustain. County leadership, along with OCJ, should immediately initiate a planning strategy for a new facility. If it such planning were to begin tomorrow it would take, realistically, ten years to simply break ground for a new facility.

***Detention Should Not Be Subordinate to Probation.*** Now that OCJ has assumed administrative control over the JTDC, it might be considering how the JTDC fits within its overall organizational structure. Not having much experience running such a facility, OCJ might be tempted to re-structure so that the JTDC is under the Juvenile Probation Department, a department within OCJ that has experience working with the juvenile population. Mr. Dunlap believes very strongly that it would a grave mistake for OCJ to organize in this fashion.

Simply put, the Probation Department serves as the "gatekeeper" of the juvenile justice system. Determinations to hold a juvenile in custody are driven by policy promulgated by the Juvenile Court and administered by Probation. History supports that Probation, as a "user" of detention, has the capacity and in some cases the motivation to abuse the use of detention. Furthermore, Probation may well view

6

detention as a natural consequence should a juvenile violate the terms of probation. Additionally, if the JTDC is not on an even playing field with Probation in the Court's organizational structure and if the JTDC is subject to the Probation Department's fiscal planning, the likelihood of the JTDC experiencing a "step child syndrome" will increase significantly.

### Conclusion

The successful reform of the JTDC came as a result of unique collaborative effort on the part of all parties to *Doe* litigation over the past eight years. Mr. Dunlap would like to additionally acknowledge the following individuals: First, Jennifer Koehler, who in 2007 worked in Cook County government on special assignment to the JTDC. Ms. Koehler was instrumental in working with the *Doe* parties to draft the Order Appointing the Transitional Administrator (TA) in August 2007. Second, Deputy Transitional Administrator Brenda Welch, who also served as Compliance Administrator prior to the Order Appointing the TA. Ms. Welch worked tirelessly, especially in the early years 2008-2011 and beyond when leadership was negligible and resources were lean. In many ways it was she that kept the "ship afloat" during this period. Third, Ms. Teresa Abreu, JTDC General Counsel and Deputy Executive Director for Administrative Services who would serve as Acting Executive Director of the JTDC for over two years and at a time when the TA was faced with major health problems. Ms. Abreu was instrumental in implementation of the TA's Staffing Plan, which was submitted to the Court in 2010. In her capacity as Acting Executive Director Ms. Abreu led the JTDC to

receiving accreditation from the National Commission on Correctional Health Care as well as national recognition for the many programs and services available to residents. Finally, counsel at Loevy & Loevy served as the TA's written communicator to the Court and helped the TA negotiate many "troubled waters" over the past eight years.

                                                                                     RESPECTFULLY SUBMITTED,

                                                                                     /s/Earl Dunlap
                                                                                   Court Appointed Expert &
                                                                                   Former Transitional Administrator

                                                                                   /s/Elizabeth Mazur
                                                                                  Counsel for Mr. Dunlap

Arthur Loevy
Jon Loevy
Elizabeth Mazur
Steven Art
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, Illinois 60607
(312) 243-5900

## **CERTIFICATE OF SERVICE**

      I, Elizabeth Mazur, an attorney, certify that on August 28, 2015, I served a copy of this document on all counsel of record via the Court's ECF system. In addition, a copy of this document will be sent by electronic mail to counsel for the Office of the Chief Judge of the Circuit Court of Cook County.

                                               /s/Elizabeth Mazur